[Civ. No. 8857.   Third Dist.   Nov. 19, 1956.]

CITY OF SACRAMENTO, Respondent, v. CHARLES T. JENSEN et al., Appellants.

Pierce & Brown and Fred Pierce for Appellants.

Everett M. Glenn, City Attorney, and Mento, Buchler & Littlefield for Respondent.

VAN DYKE, P. J.—The city of Sacramento, respondent herein, claiming to be the owner of an easement over certain lands, brought this action against appellants Charles T. Jensen and wife. The city alleged that since May 9, 1927, Blair Avenue, as shown on the official plat of Victory Acres filed in the office of the county recorder of Sacramento County on April 26, 1927, has been a public highway or street; that originally the easement for public use had been vested in the county of Sacramento, and that by annexation proceedings the territory embracing said avenue had become a part of the respondent city so that the city succeeded to the easement rights theretofore held by the county; that defendants had wrongfully entered upon said avenue and had ousted and ejected the city therefrom and had excluded the public from the public's right to pass and repass over the same. The appellants denied that Blair Avenue was a public street or highway, alleged that they owned the same to the center line thereof exclusive of any right or easement in favor of the public and asked that their title thereto be quieted. Judgment was rendered in favor of the city, and the Jensens appeal.

The court found that a street commonly known as Blair Avenue, as shown on the said official recorded map, since May 9, 1927, and up to February 26, 1953, had been a public street in the county of Sacramento and since said last mentioned date, by valid annexation proceedings, had become a public street in the city of Sacramento; that it was 60 feet in width, running from its easterly terminus on a public highway in said city, westerly to the easterly boundary of the right of way of the Southern Pacific Railroad; that, while said street was a public street, appellants herein had entered upon the same and ousted the public from the southerly 30 feet of said 60-foot street; that said acts were wrongful and unlawful; that the respondent city was the owner of a valid easement for the use of the whole of said street. The court concluded that the city was entitled to possession of the whole of said avenue and entered judgment accordingly.

The record discloses the following facts stated most favorably in support of the judgment appealed from: In the early part of 1927 Joseph L. Steffens, sole owner of approximately 98 acres of land lying westerly of Freeport Boulevard where it passes the Sacramento Municipal Airport, and easterly of the Southern Pacific right of way, caused the area to be surveyed and platted as a subdivision for sale by lots. The subdivision bore the name "Victory Acres" and when the plat thereof had been prepared in accordance with the existing law regulating the subdivision of land for sale by lots, Steffens presented the map to the Board of Supervisors of Sacramento County. The map showed that the area had been divided into 113 lots of varying sizes, and that eight streets ran westerly from Freeport Boulevard to the western boundary of the area. One street ran north and south, separating the most westerly lots from those lying to the east. One of the streets shown on the plat was Blair Avenue, located about the center of the subdivision. On March 21, 1927, the board of supervisors passed a resolution approving the proposed subdivision map, but stating the following: "With the exception that the Board does *not* accept the roads as public highways and the Clerk of the Board is hereby authorized to make the necessary changes on said map." It appears there was presented to the board at that meeting a letter dated March 14, 1927, from the county engineer which stated that he had examined the map and found it satisfactory, with the exception that the owners were offering to dedicate roads. The engineer stated that the offer of dedication was not in harmony with a resolution passed previously by the board setting up requirements for acceptance of subdivision dedications, and he, therefore, recommended against accepting the dedications at that time. The proffered map contained on its face a form for its approval and for acceptance of the proffered dedications. Pursuant to the resolution this form on the proposed plat was made to read as follows: "The Board of Supervisors in and for the County of Sacramento, State of California, do hereby approve this map of '*VICTORY ACRES*' and do *not* hereby accept on behalf of the public the dedications herein mentioned and shown." (Last emphasis ours.) Mr. Steffens recorded the plat on April 26, 1927.

At the time the foregoing proceedings were taken the applicable statute law governing the subdivision of any tract of land into lots for the purpose of sale provided that if any such plat offered for dedication any highways the

board of supervisors should "endorse thereon which of the highways so offered for dedication" were "accepted on behalf of the public" and further provided that only such highways as had been so accepted and no others should become dedicated to the public use. (Stats. 1923, chap. 163, p. 380.) It has been held that words of dedication on such a map are to be treated merely as an offer to dedicate and that dedication is not completed until the offer is accepted. (*Stump* v. *Cornell Const. Co.*, 29 Cal.2d 448, 451 [175 P.2d 510].) Further, that since the statute required that the offeree either accept or reject an offer of dedication at the time the map was approved, the refusal to accept constituted a rejection of the offer to dedicate. (*Id.*, 451.) As the matter stood, therefore, when the map of Victory Acres was recorded the offer to dedicate appearing on the face of the map had been rejected. Notwithstanding such rejection, however, the subdivider recorded the map. This, under the existing law, he had a right to do.

It further appears from this record that on May 9, 1927, following the recordation of the map, the Sacramento County Board of Supervisors adopted a resolution to the effect that the streets appearing on the recorded map, including Blair Avenue, were all accepted for public highways of the county of Sacramento. The resolution went on to state: "In so accepting the same this Board consents to and acquiesces in the dedication of said highways heretofore made by the owners of the property situate within the boundaries of said Victory Acres, and herein reference is hereby especially made to the dedication of said highways upon said official plat of Victory Acres." At the same meeting the board passed a resolution of intention to improve highways in "Victory Acres" as shown on the official map thereof, including Blair Avenue for its entire length, the work to be done in accordance with plans and specifications adopted by the board and filed in the office of the board's clerk. It was further ordered that the cost of the work be chargeable to and charged upon all of the land in Victory Acres. Appropriate proceedings were taken for the doing of the work, and in September of 1927 the work of improvement was reported as having been completed at a total cost of approximately $14,000 paid by the county. The engineer of the work certified to the board that, pursuant to the contract between the county surveyor and the contractor, approximately 585 linear feet of galvanized corrugated metal culvert of varying sizes had been furnished and in-

stalled, that 2,637 cubic yards of excavation and grading had been done and that 183,636.6 square feet of 4-inch cementing gravel pavement had been completed in place. It does not appear from the record that any of these proceedings found their place in the Recorder's Office as recorded information of the acceptance of the streets as public streets or their improvement after acceptance. Neither does there appear to have been any record of a second offer to dedicate, communicated to the board expressly by the subdivider and accepted by the board. However, respondent city contends that the foregoing, which transpired after the rejection of the statutory offer to dedicate, amounted to a common law dedication, with the result that at least after the improvement work had been done at county expense, the streets were public streets, and the easement of the county in said streets thereafter passed to the city under annexation. This contention of the city, we think, must be sustained.

A common law dedication has been described as a voluntary transfer of an interest in land which partakes both of the nature of a grant and of a gift and which is governed by the fundamental principles controlling such transactions. █ Essential to such a dedication are an offer by the owner of the land, clearly and unequivocally indicated by his words *or acts* to dedicate the land to a public use and an acceptance by the public of the offer. (*Union Transp. Co.* v. *Sacramento County,* 42 Cal.2d 235, 240 [267 P.2d 10].) In 15 California Jurisprudence, 2d, "Dedication", section 80, page 387, it is stated:

"Whether there has been a common-law dedication of land to public use is a question of fact, to be determined by the trier of fact from the circumstances of each particular case."

█ Applying these rules, we cite the following facts as substantially supporting the finding of the trial court that Blair Avenue is a public street. The owner of the tract who subdivided it for sale announced his intention to effect a statutory dedication by the matter appearing upon the map which he had prepared and which he presented to the board of supervisors. It is true that the supervisors at that time rejected the offer to dedicate. Nevertheless, it appears that they did so because the offer did not comply with certain requisites which they had set up and which were referred to in the letter of the county engineer, recommending a rejection at that time. Within approximately six weeks the board adopted its resolution of acceptance, and at the same

time embarked upon improvements under the Improvement Act of 1911, at county cost initially, but charged upon all of the lots in the subdivision, which presumptively were still owned by the subdivider who prepared and presented the map. It is scarcely to be supposed that the subdivider was not in contact with and negotiating with the board of supervisors to obtain an acceptance of a continuing or a renewed offer to dedicate. All of the formal proceedings necessary to charge a public improvement upon his property were gone through with, including publication of the notice of intention as required by statute. Following the letting of the contract it must be supposed that he was aware of the invasion of his property by the contractor who was doing the extensive work of improving the streets in his subdivision. The record is barren of so much as a suggestion that he did not consent to the doing of the work. This acquiescence may fairly be referred back to the period between the rejection of his offer of statutory dedication and the formal acceptance by the board which followed some six weeks later. From all of the foregoing it is a fair inference that prior to this formal acceptance by the board, the board had received a renewed offer to dedicate upon the conditions imposed by the county. We hold the evidence is amply sufficient to sustain the factual finding of the trial court that Blair Avenue had been offered for dedication as a public street and accepted as such by the county. Therefore, since long before appellants obtained any interest in land in the subdivision, Blair Avenue was a public street.

Appellants claim that the city is estopped to claim an easement. They introduced evidence of the following: Charles Jensen, since 1930, has been engaged in the business of agricultural crop dusting. He originally operated from the Sacramento Municipal Airport. In 1939 he began the purchase of land lying within Victory Acres. He ultimately purchased an "L" shaped tract of land within the subdivision. Ultimately, he bought and still owns a tier of lots lying along the westerly side of the subdivision and extending south from Blair Avenue. There were seven of these lots and they were contiguous. He also purchased a tier of lots, six in number and comprising all of the remaining lots which touched Blair Avenue on the south. He also purchased the lots lying south of the last mentioned tier of lots which bordered Thiery Road. All this property was conveyed to him by lot descriptions referring to the recorded map. Mr. Jensen had been familiar with Vic-

tory Acres since 1930. He drove past it almost daily, going to and from his work at the airport, and he had flown over it many times. He introduced in evidence several aerial photographs of the subdivision. These pictures show gray strips along the courses of the streets of the subdivision. His counsel say in their opening brief: ''These photos also tell a story as clearly as words could—of an unsuccessful subdivision, landmark of the depression of the 1930s—with its graded but unopened streets and entirely devoid of houses or other buildings.'' Mr. Jensen described the terrain as follows: ''Someone had attempted to grade, drain off areas to outline the road. There was no roads there. There was a proposed area to be used for road that had a drain culvert or drain, graded area to let the water drain off the edge and drain onto the lower areas. . . . The roads went nowhere. . . . There was no evidence of travel excepting for people [who] went rabbit hunting or parked with the intent of going nowhere . . . the area there had been pastured off. It had cattle in it. As far as vehicle travel there was vehicle tracks all over the place, not on the set-up area for proposed roads.'' Mr. Jensen testified that having seen the graded strips, he made inquiries and obtained information that these were not public roads and that when he purchased he had no knowledge of any dedication. Before he completed his purchase he obtained title insurance. The policies were placed in evidence and they contain the assertion that ''The roads shown on the plat of Victory Acres have not been accepted by the Board of Supervisors as public roads.'' Jensen said that he believed the grading had been done by the subdividers who had offered to dedicate the streets. Mr. Jensen produced evidence that when he purchased, there was not a single building on the tract. He testified that he bought the property to serve as a site from which to carry on crop dusting operations which involved the building of an air strip from and on which his crop dusting planes could take off and land, with adjacent hangars, office, warehouse and other buildings; that the area was not suitable for these purposes if it were intersected by streets running through the property he purchased and along the north edge thereof where the city claimed Blair Avenue was situated. He first moved onto the tract in 1939 and built a small building. He also proceeded to grade Blair Avenue from Freeport Boulevard to the point on his property where he was establishing his building. He laid out and improved his air strip on the westerly tier of lots, ending it at the point

where Blair Avenue is indicated on the map. He maintained "No trespassing" signs along the route of Blair Avenue, continuously from the latter part of 1939. During the war the United States Army billeted the guards of the airport on property lying westerly of the Southern Pacific right of way and in order to have access to Freeport Boulevard, the government asked and obtained a permit from Mr. Jensen to use the road along Blair Avenue as he had improved it up to the point of his building and his consent to extend that road across the Southern Pacific borrow pit on its right of way and under the trestle upon which the Southern Pacific at that time maintained and still does maintain its tracks. All of this was done. The government improved the road along a 16-foot wide strip, enough for two cars to pass. It erected a stop sign at the point where it went by the northerly end of Jensen's air strip. It carried the roadway it built across the Southern Pacific right of way and under the tracks and to the barracks it maintained westerly of the tracks. After the war it surrendered the road, and since that time Mr. Jensen has continuously maintained it, filling in holes in the pavement, resurfacing it and the like. After he had obtained his property, Mr. Jensen had discussions with an assistant district attorney of the county and with the county engineer. This occurred in 1948. He was inquiring as to whether or not the county claimed any easement along Blair Avenue. These two men went to the Recorder's Office, examined the plat of Victory Acres and noticed the endorsement thereon that the roads had not been accepted. Mr. John B. Heinrich, the assistant district attorney, advised Mr. Jensen that there was nothing in the records which showed the roads to be public roads and gave it as his opinion that they were not county roads. The county engineer had conversations with Mr. Jensen to the same general effect as those related between Heinrich and Jensen, and he wrote a letter to Jensen stating the roads were not public roads and that Jensen could fence the property and improve it as he pleased. He also said that at no time that he was county engineer had any work been done on these roads. Thereafter, the area was annexed to the city and the city, because of intensive development of the area west of the railroad right of way, found it desirable to fully improve and completely use Blair Avenue as a connecting street between Freeport Boulevard and the development to the west.

We have already said that a common-law dedication of the streets shown on the map of Victory Acres had occurred

long prior to the time when Mr. Jensen became interested in the property within the subdivision. Such a dedication once completed is irrevocable. It is not contended here and could not be that the county or the city has abandoned Blair Avenue. It is stated in *County of San Diego* v. *California Water etc. Co.*, 30 Cal.2d 817, 823, 825, 826 [186 P.2d 124, 175 A.L.R. 747]:

"The cases are apparently uniform to the effect that, if the Legislature has provided a method by which a county or city may abandon or vacate roads, that method is exclusive. . . .

.  .  .  .  .  .  .  .  .  .  .  .  .

"It is true that in some 'exceptional cases,' or situation where 'justice and right require it,' a governmental body may be bound by estoppel. . . .

". . . It is clear, however, that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public."

It is apparent that the factual question of estoppel was the subject of much conflict in the record. True, the county, its board knowing that, despite a refusal to accept dedication, the approved map could be and might be recorded, firmly and finally rejected the original offer of dedication and thereby must have known that the public records might well be construed to that effect. True also, it did not in any way require that the following offer and acceptance should take such form as to be entitled to public record, thus giving constructive notice that despite the original rejection, a subsequent dedication had occurred. True also, and probably in view of the fact that the public was not making any extensive or perhaps any use at all of the streets, never did the county, so far as this record shows, exercise any further active sovereignty over them. ■ Without attempting to state all of the facts appearing in the record from which support might be drawn for a holding of estoppel, the fact remained that the trial court found that estoppel had not occurred. And, therefore, the question is whether or not that finding is supported. ■ Estoppel is a question of ultimate fact. ■ Among those things in the record which support the finding, we may state the following: The title policies with their assertion that the roads had not been accepted by the county and were not public roads were private representations or warranties aris-

ing by contract between the companies and Mr. Jensen. For ten years before he purchased the property Mr. Jensen knew that the land appeared to have been subdivided into lots, separated by streets, and that there had been extensive improvements at one time made within the street areas suitable to make the streets fit for public use. When he purchased he took deeds which conveyed lots to him according to the lot descriptions found on the recorded map, and his only claim to now own to the center of the apparent streets is based upon the theory that conveyances of lots bordering on public streets go to the center of the street, subject to the public easements. True, neither Mr. Jensen nor the assistant district attorney nor the county engineer discovered the actual existence in the files of the board of supervisors of the resolution of acceptance and the street improvement proceedings, nevertheless they were within those records and were ultimatly discovered prior to the bringing of this suit by the city. Under the circumstances, the court was not bound by Mr. Jensen's testimony that he was a bona fide purchaser in good faith without notice or knowledge of the public easement, and in view of this record the finding of the court to the contrary is sustained.

Appellants contend that in any event the public easement is limited to the 16-foot improved strip down the center of Blair Avenue. The contention cannot be sustained. There is evidence of grading and drainage beyond the limits of the graveled strip, and the user made by the street improvements was a taking of possession and use of the public easement to the full width appearing upon the recorded map. The fact that the public made little or even no use of the streets, did not show abandonment nor give rise to any support for a claim of estoppel in favor of appellants.

The judgment appealed from is affirmed.

Peek, J., and McMurray, J. pro tem.,* concurred.

A petition for a rehearing was denied December 14, 1956, and appellants' petition for a hearing by the Supreme Court was denied January 16, 1957. Schauer, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.