[Civ. No. 6143.   Fourth Dist.   Nov. 10, 1959.]

THE PEOPLE ex rel. JAMES DON KELLER, as District Attorney, etc., et al., Appellants, v. LA VISTA CEMETERY ASSOCIATION (a Corporation) et al., Respondents.

Henry A. Dietz, County Counsel (San Diego), and Robert G. Berrey, Deputy, for Appellants.

Clinton F. Seccombe and Cameron & Foushee for Respondents.

SHEPARD, J.—Plaintiffs brought this action to quiet the title of the public and the county of San Diego in and to an easement for a public street or highway across La Vista Cemetery, and to enjoin defendants from interfering with the use of said highway by the public. The area in dispute lies entirely within the boundaries of the cemetery and is shown on the cemetery map as Main Avenue. We shall hereinafter use that name as indicating the area in dispute. Defendants filed a cross-complaint seeking in essence a decree of court that plaintiffs' public has no right to go upon the property except for legitimate cemetery purposes. For the sake of brevity, we will refer to the parties as plaintiffs and defendants. The court rendered judgment for defendants against plaintiffs, and plaintiffs appeal.

The record before us shows substantially the following

facts. The general area now occupied by the La Vista Cemetery has been used as a cemetery since about the year 1870. Prior to the year 1894 the record does not show what, if any, maps or plats were recorded. In 1894, La Vista Cemetery Association was formed, took title to the area including the then existing cemetery, and filed in the office of the county recorder of San Diego County a map showing lots, blocks and avenues of access. The cemetery, as shown by this map, apparently occupied approximately the south three-fourths of the southwest one-fourth of section 108 of Rancho de La Nacion, according to the map thereof Number 166 in the county recorder's office of San Diego County. As hereinbefore noted, the approximate area in dispute is that portion named on the map as Main Avenue. Main Avenue appears to be the only means of ordinary vehicular access to and egress from the cemetery as a whole, and the grave plots therein contained. From a point near the southwest corner of the cemetery this avenue meanders in a general northeasterly direction to a point near the northeasterly corner. It divides the cemetery into two parts, each of which is roughly triangular in shape and each of which is approximately the same size. In order to conform to the very irregular pattern of the 14 blocks contained in the cemetery and to connect with the various smaller avenues, paths and ways which give access to the grave plots of the cemetery, it changes its course and curves some 14 times and its width varies from 40 to 60 feet. In addition to giving access to the various smaller ways, as above indicated, there are also located on its own border a large number of grave lots. At its southwesterly exit it opens onto Orange Avenue near that avenue's intersection with 32d Street. At its northeasterly exit it opens onto Granger Avenue. The record does not show whether the two exits originally connected with public roads or where such public roads, if any, led to.

Prior to the filing of this action there is no public record of any public agency claiming any right of way through any of the cemetery avenues. Since about 1948 or 1949, signs have been maintained at each exit and along the road warning of the character of the property, of the fact that permission to pass over might be terminated at any time, and restricting speed limits. There is evidence that Main Avenue, along with all other avenues in the cemetery, had some maintenance work done on it by the county road crew during the years from 1927 to 1948, but apparently most of such work was done on

Main Avenue. There is also evidence that other public spirited organizations, including the American Legion and the Boy Scouts, did maintenance work in the cemetery and on these avenues. There is also evidence that at one time a fence was put up stopping traffic, and later taken down. The period of time that it was up is not shown but it was apparently brief, and it is not quite clear if it was on Main Avenue or some adjacent foot path. The evidence does not show that there exists any record that the county ever received permission to grade, maintain or improve the road in question, nor is there any record that the board of supervisors ever accepted a public highway over this road nor is there any record that the board of supervisors ever ordered any improvement work or any work of maintenance on this road. The cemetery records indicate fairly active and continuous use of the cemetery through the period of its approximately 90 years existence. It contains a total of 1,000 burials, of which about 180 were between 1870 and 1894, about 170 between 1894 and 1920, about 500 between 1920 and 1949, and about 150 from 1949 to date of trial. Some roads shown on the plat are not graded but all interment locations are approachable by graded avenues, and Main Avenue is necessary for use in access to all graves since it is only through Main Avenue that exits to the cemetery as a whole can be reached.

The only issue presented by appellants is whether or not the public or the county acquired a right of way for a public street or highway through and on Main Avenue, under the facts here presented.

Plaintiffs contend that such right of way has been acquired through implied dedication, and they also contend that such right of way was obtained through prescription.

▮ Respondents raise serious questions relative to the right of the public to ever put public roads through cemeteries. They cite numerous authorities to indicate that legislative policy has placed cemeteries under a special protection and regulation of the state, and that by reason thereof the rules respecting acquisition of rights of way by implied dedication or prescription should not apply to cemeteries. For example, an act relating to rural cemetery associations passed in 1859 [Stats. 1859, p. 281] provides that cemetery lands shall be exempt from all public taxes, not liable to execution, and that during the time they are held for cemetery purposes "no street, road, avenue, or thoroughfare, shall be laid through

such cemetery, . . ." Statutes of 1911, page 1100, provides that:

"No streets, alleys or roads shall be opened or laid out within the boundary lines of any cemetery located in whole or in part within the lines of any city or city and county of this state, where burials have been had within five years prior thereto, without the consent of the corporation or association owning and controlling such cemetery." (Gen. Laws of California, 1923, Part One, p. 418.)

In 1931, a prohibition almost identical with that contained in the act of 1859 was inserted in the General Cemetery Act (Stats. 1931, p. 2434) with the addition thereto of the necessity of obtaining permission from two-thirds of owners of burial lots therein (p. 2439, § 9). Upon the adoption of the Health and Safety Code in 1939 a similar provision was incorporated in section 8560, and additional provisions evidencing the protective policy of the state toward cemeteries were expressed, notably in sections 8553, 8558, 8559, 8560.5 and 8561. In addition it will be noted that our California Constitution, article XIII, section 1b, exempts cemeteries from taxation.

In our view, these enactments are mere detailed specifications of the general policy of the common law placing cemeteries in a special category, receiving particular protection from many of the rules applied to private individuals, and preventing cemetery lands from being encroached upon except under those special circumstances which the sovereign general policy permitted as evidenced by legislative enactment or judicial pronouncement. This policy is also apparent in different ways in the decisions of other states. (*Bitney* v. *Grim*, 73 Ore. 257 [144 P. 490]; *Tracy* v. *Bittle*, 213 Mo. 302 [112 S.W. 44, 15 Ann.Cas. 167]; *Spear* v. *Locust Wood Cemetery Co.*, 72 N.J.Eq. 821 [66 A. 1068]; *Peterson* v. *Stoltz* (Tex. Civ.App.), 269 S.W. 113, (trust character of cemetery land ownership); *St. Peters Evangelical Lutheran Church* v. *Kleinfelter*, 96 Pa. Super. 146 (preventing use as a blacksmith shop); *Evergreen Cemetery Assn.* v. *New Haven*, 43 Conn. 234 [21 Am.Rep. 643] (preventing public street intrusion); *Memphis State Line Railway* v. *Forrest Hill Cemetery Co.*, 116 Tenn. 400 [94 S.W. 69]; *Dunbar* v. *Oconomowoc Cemetery Assn.*, 189 Wis. 164 [207 N.W. 265] (preventing use inconsistent with cemetery purposes.)

We think the general adoption of this area as a community cemetery in 1870, plus the formal dedication by map

in 1894 and its continued use as a cemetery makes all of the property, including that which is under dispute, clearly dedicated to cemetery purposes as defined in various acts hereinbefore referred to. (*Archer* v. *Salinas City*, 93 Cal. 43 [28 P. 839, 16 L.R.A. 145]; Stats. 1859, p. 281, as amended by Stats. 1911, p. 1099, §§ 4, 10, 11; General Cemetery Act, Stats. 1931, p. 2434, §§ 7, 8; Health & Saf. Code, § 8553.)

■ Plaintiffs apparently contend that continued adverse use raises the inference of voluntary transfer or dedication. However, we think it clear that, in the case at bar, under the particular facts here present such inference would not be conclusive. Of the people who were supposed to have used this street, ranging from only five persons up to 600 persons (depending on the witness), there is no showing as to how many were using it to view or reach cemetery graves or for other cemetery reasons and how many, if any, were completely disconnected with cemetery purposes. Neither was there any showing that the governing board of the cemetery had or could have had any such knowledge, or that anyone at any time directly claimed to the governing board that they had any greater right than to use the roadway for ordinary cemetery purposes. Thus the matter in our opinion became a question of fact as to whether or not any of the use was adverse and, if so, for what period of time.

In 1883, Political Code, section 2621, was enacted prohibiting the establishment of public highways by user alone (*Lantz* v. *City of Los Angeles*, 185 Cal. 262 [196 P. 481]; *Union Transp. Co.* v. *Sacramento County*, 42 Cal.2d 235, 242 [12] [267 P.2d 10].) ■ Furthermore, an essential of every dedication is "an offer by the owner of the land, clearly and unequivocally indicated by his words or acts, to dedicate the land to a public use and an acceptance by the public of the offer." (*Union Transp. Co.* v. *Sacramento County, supra*, p. 240 [3].) ■ Proof of user would constitute some proof but not conclusive proof of dedication. It is to be noted also that immediately after the decision in 1954 of the Union Transportation Company case the Legislature amended section 941 of the Streets and Highways Code directly forbidding the inclusion of any road in the county system without a formal resolution of the board of supervisors (Stats. 1955, p. 2232).

■ The rule followed since the decision in the case of *Union Transp. Co.* v. *Sacramento County, supra*, has uniformly been that the question of whether or not there has been a dedication of land to public use is to be determined by the trier of fact

from the circumstances of each particular case. (*Walter G. Brix Inc.* v. *Brown,* 145 Cal.App.2d 177, 179 [4] [302 P.2d 74]; *City of Sacramento* v. *Jensen,* 146 Cal.App.2d 114, 118 [1] [303 P.2d 549]; *Crimmins* v. *Gould,* 149 Cal.App.2d 383, 389 [4] [308 P.2d 786].)

"The evidence of the use of this road for a number of years did not necessarily compel a finding that it was a public road. (Sts. & Hy. Code, § 904.) The most that can be said is that the evidence of such use might have been considered with other evidence on the question of whether the owners intended to dedicate the road to public use." (*Dunn* v. *County of Santa Cruz,* 67 Cal.App.2d 400, 402 [1] [154 P.2d 440].)

We are confronted in the case here at bar by different inferences which the trial court might properly draw from the evidence before it on the question of intent to dedicate for highway purposes and on the question of whether or not the use was adverse. On both of these questions the trial court found against the plaintiffs. If there was sufficient evidence for either finding, plaintiffs' case must fall. We are satisfied that the evidence here presented was sufficient to support the decision of the trial court. Thus, we find it unnecessary to decide the question whether, under any circumstances, there ever could, by implied dedication or prescription, be an acquisition of a public highway through a cemetery.

Judgment affirmed.

Griffin, P. J., concurred.