[No. D006716. Fourth Dist., Div. One. Nov. 30, 1989.]

JOHN HAYS, SR., et al., Plaintiffs, Cross-defendants and Respondents;
EARL WILSON et al., Plaintiffs, Cross-defendants and Appellants, v.
GEORGE VANEK et al., Defendants, Cross-complainants and Appellants;
COUNTY OF SAN DIEGO, Cross-defendant and Respondent.

**[Opinion certified for partial publication.[1]]**

---

[1] Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of parts IV and V.

**COUNSEL**

Michael H. Wexler, Steven Berkowitz, Lindley, Lazar & Scales, David W. Waters, Chris J. Allred, Borgerding, Peterson, McGrath, Burnell, Glauser & Waters and Suuzen Ty Anderson for Plaintiffs, Cross-defendants and Appellants and for Plaintiffs, Cross-defendants and Respondents.

Robert J. Hanna, Hillyer & Irwin, Ronald R. House, Bryans & House, James H. Harmon, Anne C. Richardson, Byrd, Sturdevant, Harmon &

Pace, Gregory W. Wagner, Conrad, Friday & Wager and Lesley Ann Ash for Defendants, Cross-complainants and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, Lewis P. Zollinger and Barbara Baird, Deputy County Counsel, for Cross-defendant and Respondent.

## OPINION

**WIENER, Acting P. J.**—This case involves a winding dirt road—Casa de Roca Way—in rural Alpine. Notwithstanding the apparent simplicity of this mundane subject, the controversy over whether this road is public or private and whether certain of the parties through adverse possession have acquired ownership rights to portions of a 50-foot strip through which the road runs—has generated a gargantuan record suggesting, to put it mildly, that the tranquility of this rural hamlet consisting of about 15 homeowners has been materially disrupted. Except for the County of San Diego (County), all the parties to this litigation are neighbors, owning land abutting the roadway. Some homeowners are pleased with the judgment declaring the road is private and with their newly acquired rights to property obtained through adverse possession. The remaining owners, less satisfied with this result, challenge the judgment on a number of grounds.

The satisfied litigants are plaintiffs John and Carolyn Hays, Earl and Alice Wilson, Leroy Wilson and Richard and Nancy Tobin. The appellants are defendants Kenneth and Alice Hittle, Vasa Snorey, John and Linda Egbert, Enrique and Rafaela Ochoa, Kenneth and Betty Copeland, Richard and Rita Quatman, Shirley Strauch, Jack and Saljaque Haydon and George Vanek.

The County prevailed on the Haydons' and Vanek's cross-complaint seeking a declaratory judgment that title to Casa de Roca Way was in the County or in the general public.

For the reasons set forth below, we reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*History*

To fully understand the arguments made by the respective parties it is necessary to briefly sketch the history of ownership and development of property which is the subject of this litigation.

Shortly before 1900, Casa de Roca Way was depicted on government maps as a traveled way which connected the Viejas Valley with the

Sweetwater River. The earliest such map is an 1891 plane table survey map which was drawn in that year by E. T. Perkins for the United States Geological Survey (U.S.G.S.). The road was also depicted on a 1903 "Cuyamaca Quadrangle Map" prepared by U.S.G.S. and on a 1955 soils map maintained by the County.

The land through which the road passed was patented under the Federal Homestead Law to the following persons: Robert Dockery (1890); Martha Todd (1893); Jonathan Spencer (1895); and Anna Sandin (1900). Later, title to much of the subject land was acquired by Neil Rasmussen who was the predecessor in title to the parties here.

In 1926, Rasmussen subdivided his property by preparing a Shady Brook Arbitrary Office map depicting hundreds of 110- by 25-foot lots. The map showed the road as a 50-foot strip running through the subdivision on the same course as on the government maps referred to above. (A copy of the map is attached to this opinion as appendix A.)

Rasmussen staked the lots shown on the Shady Brook map and advertised them for sale in San Diego newspapers. He used the road to provide access to the subdivision and to show the lots to prospective purchasers. The newspapers in evidence revealed the lots skyrocketed in value from $20 to $50 as a result of Rasmussen's energetic marketing efforts. Parcels were sold by metes and bounds descriptions and the deeds for parcels adjacent to the road generally conveyed property to the edge of the 50-foot strip. Twenty-foot lateral easements perpendicular to the road were referred to in the deeds for the purpose of accessing lots not adjacent to the road. The deeds did not reserve or grant easements for the use of the road itself. One deed, recorded on March 18, 1927, conveyed a 110- by 75-foot parcel from Rasmussen to Frank and Mabel Knight but excepted from it "that portion which is dedicated for road."

In October 1932, assessor's map No. 23 was prepared by the County, certified by the board of supervisors and recorded. It is virtually identical to the Shady Brook map and was obviously made from it. It depicts the same lots and road. (A copy of the map is attached to this opinion as appendix B.)

After some initial marketing success, interest in Rasmussen's subdivision dwindled. Following some 173 conveyances of varying sized parcels, Rasmussen deeded the remainder of the subdivision property by quitclaim deed to Charles Bernard in 1942. By separate quitclaim deeds in 1943 and 1946, Bernard conveyed the property to William Canning who, in 1957, conveyed a substantial portion of the property to John Kynder. For the first time in the Canning to Kynder deed, the 50-foot strip is physically described and

reserved as "an easement and right of way for road, pipe lines and utility purposes . . . ." Later deeds, including conveyances to some of the parties in this case, purport to *grant* easement rights over the 50-foot strip for purposes of accessing the conveyed property.

*Developments Leading to This Litigation*

In recent times the road, less than one mile long, has served basically as an access road traveled mainly by residents and their visitors. (A trial exhibit depicting the 50-foot strip and current ownership of most of the surrounding property is attached as appendix C.) For a short period of time during the 1950's, the road was maintained by a County employee using County equipment. It was unclear who authorized the maintenance.

The area is covered by dense brush and oak trees. The parties' houses are modest structures built in an eclectic manner to suit their individual tastes. Now, Casa de Roca Way begins at the nearest paved road, Alpine Boulevard, and meanders southward up a steep hill, coming to an effective dead end at the top where a gate blocks the entry to Vanek's 40 acres.

In 1983, Vanek found out that in the event he wished to subdivide his 40 acres, he was prevented from doing so because the Subdivision Map Act required the development to be served by a 50-foot-wide public road. Casa de Roca Way was not wide enough.

At Vanek's request Baseline Engineering Co. surveyed the road. The survey (survey No. 9610) showed the traveled way ran inside a 50-foot-wide easement. Vanek chalk marked out the easement shown by the survey and told his neighbors he planned to remove all of their improvements within the marks. Obviously Vanek's plans were not well received by his neighbors who had front yards, landscaping, fences and garages within the chalk marks and who believed the property so occupied belonged to them. When Vanek started to implement his intentions by removing some of his neighbors' encroachments, those neighbors sought an injunction and this case ensued.

*Pleadings and Trial*

The action split the neighbors into two groups: the defendants owning no property within the chalk marks who did not object to a 50-foot-wide road, and the plaintiffs, owning property within the chalk marks who were unwilling to give up their land for Vanek's benefit. Plaintiffs sought to quiet title to the parts of their front yards that fell within the 50-foot easement and to enjoin Vanek from taking further action to widen the existing road.

Defendants filed various cross-complaints and answers alleging the improvements were "encroachments" on what they thought to be a 50-foot-wide public road. Vanek and Haydon cross-complained against the County for declaratory relief which would allow them to develop and sell their land without complying with the Subdivision Map Act. In a separate action (Super. Ct. San Diego County, No. 555466) entitled George Vanek v. Earl Wilson, Leroy Wilson and Alice Wilson, which has now been consolidated with the primary litigation between the parties, Vanek was temporarily restrained from walking in front of the Wilsons' homes and from harrassing and annoying them.

In a court trial the principal case was tried in two phases. The court first tried Vanek's cross-complaint against the County, granting a nonsuit on Vanek's eleventh cause of action in which he sought a judgment declaring his 40 acres became a "subdivision" in the 1920's and that he could now develop and sell this "subdivision" without complying with the Subdivision Map Act.

The second phase encompassed all evidence as to the character and width of the road. The plaintiffs' case-in-chief to establish their title by adverse possession was followed by the defendants' case-in-chief principally devoted to proving the 50-foot-wide easement had been dedicated to public use and thus could not have been acquired by adverse possession.

At the conclusion of the evidence and after reviewing the parties' written objections and proposed changes, the court rendered a lengthy statement of decision. That decision excludes several tort claims for nuisance, trespass, emotional distress, etc., which the court said the parties could pursue at a later date if they wished to do so.

The court found "Casa de Roca Way and/or the traveled way" was a private "narrow, unimproved dirt road" running within the "subject 50-foot easement." The court also found the improvements made by the respective plaintiffs encroaching upon the traveled way extinguished the easement and the plaintiffs' acquired title to such property by adverse possession. Judgment was entered on the court's statement of decision. Defendants appeal from the judgment. The Wilsons cross-appeal from the judgment dissolving their injunction against Vanek.

## DISCUSSION

### *Defendants' Appeal*

### I

### *Private/Public Road*

Defendants rely on several different theories to establish their claim that Casa de Roca Way is a public road. We discuss them seriatim.

### *The "Federal" Theory*

■ Defendants contend the road became a public road at the turn of the century because of a controlling federal statute.

They first explain that in 1866 Congress enacted the "Federal Highway Grant Statute," later codified as former section 932 of title 43 of the United States Code (Act of Congress 262, § 18, 14 Stat. 253; known as the "Act of 1866").[2] The Act of 1866 provided: "The right of way for construction of highways over public lands, not reserved for public uses, is hereby granted." The statute was enacted to encourage and facilitate settlements through a continuing offer to dedicate public land as highways. (See *Ball* v. *Stephens* (1945) 68 Cal.App.2d 843, 846 [158 P.2d 207]; *Town of Red Bluff* v. *Walbridge* (1911) 15 Cal.App. 770, 779 [116 P. 77].) Defendants then correctly point out that a public road need not be a part of a "system of highways" for purposes of imposing county responsibility for maintenance. (*Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235, 244 [267 P.2d 10].)

Based on the foregoing, defendants direct us to the historical record discussed above and argue the following events require a finding the road is public. First, the road existed as a "first class or primary road" in 1891 and is so designated on the Plane Table Survey; second, the patentees, the parties' predecessors in interest, acquired their property under the Federal Homestead Law and accordingly must have worked their land for at least five years before the issuance of patents (12 U.S. Stats. at Large, ch. 75 (1862)); and third, the road so utilized was necessarily "accepted by the public." Respectfully, we believe defendants' argument asks too much.

---

[2] Section 932 was repealed by section 706(a) of Public Law No. 94-579, the Federal Land Policy and Management Act of 1976. Section 701 of the act, however, provided that it should not "be construed as terminating any valid . . . right-of-way . . . existing on the date of approval of this Act." (See Historical Note, 43 U.S.C.A. § 1701.) Because defendants' "federal" theory asserts the existence of a public road near the turn of the century—long before 1976— the repeal of section 932 has no effect on the issue in this case.

We are unable to conclude that "public" use must be inferred from the designation of this dirt road as "first class" during a period of time when the county's population was sparse with the roads probably being primarily used by homesteaders and mining claim owners. Such use is just as consistent with private easements by prescription or necessity or with implied private licenses as with public dedication. Lacking facts, the bare legal history of the subject property is insufficient to establish a dedication to the general public before the patents were issued.

Defendants' argument is also founded on a false premise. The subject statute does not preclude the right of way from being private. (See e.g., *Western Union* v. *Pennsylvania R. Co.* (1904) 195 U.S. 540, 570 [49 L.Ed. 312, 323, 25 S.Ct. 133]; *Central Pacific R.R. Co.* v. *Alameda County* (1932) 284 U.S. 463 [76 L.Ed. 402, 52 S.Ct. 225].) We therefore reject defendants' "federal theory" as necessitating a legal conclusion that Casa de Roca Way is a public road.

*Implied Dedication of the Road to the Public*

■ A common law dedication of a roadway to the public can be proved in either one of two ways: (1) by showing approval or acquiescence of the owner in the use of the road by members of the public under circumstances inconsistent with use under a license; or (2) by establishing open and continuous use by the public for a prescriptive period. (*Gion* v. *City of Santa Cruz* (1970) 2 Cal.3d 29, 38 [84 Cal.Rptr. 162, 465 P.2d 50]; *Union Transp. Co.* v. *Sacramento County, supra,* 42 Cal.2d 235, 240-241.) The first method, implied-in-fact dedication, requires a clear and unequivocal offer by the owner to dedicate the road to a public use and an acceptance of the offer by the public. (*Union Transp. Co.* v. *Sacramento, supra,* 42 Cal.2d 235, 240.) The second method, implied-in-law dedication, shifts the focus of inquiry from the intent of the owner to the activities of the public. (*Gion* v. *City of Santa Cruz, supra,* 2 Cal.3d at p. 38.) ■ Defendants argue both theories are applicable here. We find it necessary to consider only the claim of implied-in-fact dedication.

■ We recognize it is not a trivial thing to hold that private property has been dedicated to public use. (*Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653, 662 [76 P.2d 483]; *Trask* v. *Moore* (1944) 24 Cal.2d 365, 373 [149 P.2d 854].) If a landowner's intent to dedicate property to public use is to be implied, that purpose must clearly appear from the surrounding circumstances. (*People* v. *County of Marin* (1894) 103 Cal. 223, 228 [37 P. 203]; *Laguna Beach* v. *Consolidated Mtg. Co.* (1945) 68 Cal.App.2d 38, 43 [155 P.2d 844].) The rationale underlying the strict requirements which must be satisfied to establish a dedication is to avoid potential detriment to

persons who, through inattention to legal detail or motivated by decency permit others to use their land. (*Harding & Lofton v. Jasper* (1860) 14 Cal. 642, 648-649.)

■ Whether an owner has made an offer is a question of fact requiring an examination of all the pertinent circumstances. (*Flavio v. McKenzie* (1963) 218 Cal.App.2d 549, 552 [32 Cal.Rptr. 535].) ■ The sheer size of the record in this case makes the task unenviable if not difficult. Initially, however, we are struck by the broad commercial realities of the situation. From Rasmussen's perspective, Shady Brook was a commercial development. The road bisected the subdivision and, as such, its designation as a public road seems an almost necessary step for a developer.

Moving beyond the broader view, we have spent considerable time reviewing copies of the deeds from Rasmussen to the original purchasers in the Shady Brook subdivision as well as later deeds in the relevant chains of title. After laying out a map of the subdivision which showed the road, Rasmussen conveyed parcels which could only be accessed using the road. Despite this, he never conveyed or reserved easements for the use of the road, as he did to establish the 20-foot lateral easements necessary to access parcels which did not abut the road. It is true that use of the road by the owners of property within the Shady Brook subdivision could be viewed as creating easements by necessity rather than a dedicated public road. Focusing on Rasmussen's *intent,* however, it makes no sense that he would have created explicit 20-foot lateral easements from the road but relied on easements by necessity to guarantee access to the road itself. In these circumstances, he must have understood and intended the road to be a public way.

That Rasmussen intended to dedicate the road to the public is supported by the language he used in the deed to Frank and Mabel Knight. That deed, for sake of convenience, initially described a rectangular piece of property which overlapped the road in two spots but then subtracted from that description "that portion which is dedicated for road."[3] "Dedicate" is a term of art with a particularized legal meaning. (See generally *Palos Verdes Corp. v. Housing Authority* (1962) 202 Cal.App.2d 827, 835 [21 Cal.Rptr. 225].) It is highly unlikely Rasmussen would have used the word in the Knight deed had he not intended the road to be a public road.

When Rasmussen conveyed his remaining interest in the Shady Brook subdivision to Bernard in 1942, he used a quitclaim deed. Partially as a

---

[3] The piece of property conveyed to the Knights was five-sided, shaped something like an irregular home plate in baseball. The middle of the property abutted the road at an angular bend, thus creating the rear "point" of the home plate. The Knight property is currently part of the parcel owned by plaintiffs Richard and Nancy Tobin. (See appendix C.)

result, there is no evidence to indicate whether his intent to dedicate the road to the public changed during the Depression years after interest in his subdivision dwindled. ■ Plaintiffs note that even assuming Rasmussen offered to dedicate the road in 1926 and the offer remained open for the next 16 years, Rasmussen's intent cannot be imputed to Bernard and his successors. Accordingly, they assert, any acceptance of the offer must have occurred before 1942 to be valid. They then argue the evidence is insufficient to establish such an acceptance.

■ While the evidence at trial regarding pre-1942 events was sparse, the fact the road was used by purchasers of lots in the Shady Brook subdivision to access their property is, in our view, sufficient to establish public acceptance of Rasmussen's offer of dedication. Even if it were not, however, we do not feel necessarily constrained by the 1942 date. ■ Where a purchaser of land which has been offered for dedication to a public use takes no action to revoke the offer or otherwise exclude the public, the public is entitled to assume the offer remains open. ■ Here, the post-1942 evidence establishes beyond dispute public use sufficient to constitute acceptance of the offer of dedication.[4]

■ Plaintiffs argue against a conclusion that any implied offer by Rasmussen was accepted by the public. They point to evidence indicating that in 1933, a group of Shady Brook property owners petitioned the County to build a short road 1,300 feet in length connecting U.S. Highway 80 and the existing road through the subdivision. It was suggested that the entire stretch could then be made part of the County road system. The County refused the request but indicated that such a connector could be built and the entire road accepted if the existing subdivision road was improved so that it met County standards. Plaintiffs suggest this evidence demonstrates any implied offer of dedication by Rasmussen was rejected by the County.

The fact that an offer of dedication was rejected by the County because the Shady Brook road did not meet County standards does not necessarily mean that the road was not a "public" road. A relatively recent Attorney General's Opinion addressed the question whether a county could accept an offer of dedication without also accepting responsibility for maintenance of the road. Concluding this was indeed possible, the Attorney General emphasized the difference between "public" roads in general, and those

---

[4] Plaintiffs argue that acceptance of defendants' implied-in-fact dedication argument leads to the absurd result that Rasmussen's 50-foot strip is a public right of way which continues past the gate of Vanek's property through to its southern border. On this record, it appears plaintiffs correctly extrapolate the logic of this argument, a logic we assume Vanek is aware of. Because this action does not involve anyone's claim of a right to pass across Vanek's property, however, we eschew any further comment.

particular public roads which are maintained by the county: "Although a road is a 'public street' and subject to 'public control,' it need not necessarily be maintained by the local governing entity. All roads over which the public has a right to travel, whether express or prescriptive, are 'public' roads. 'Public' roads, however, are not 'county' roads until accepted as such by appropriate resolution of the board of supervisors. (Sts. & Hy. Code, § 941; 45 Ops. Cal. Atty. Gen. 98, 100 (1965).)" (*County Responsibility for Public Roads,* 61 Ops.Cal.Atty.Gen. 466, 468 (1978).) Here, the fact that the County refused to accept Casa de Roca Way as a county road—thus imposing responsibilities for maintenance on the County—is not inconsistent with its status as a "public" road.[5]

*Width of the Dedicated Road*

■ Plaintiffs contend that even if Rasmussen made an offer to dedicate the road which was accepted by public use, the "public" road thus created is limited to that portion of the 50-foot strip actually used for road purposes. Because the record establishes that the traveled portion of Casa de Roca Way generally varies between 10 and 30 feet in width, plaintiffs contend that their driveways, retaining walls, landscaping and other alleged intrusions have never encroached upon the public road.

The bulk of authority appears contrary to plaintiffs' position. Perhaps most closely analogous is the Supreme Court's decision in *Santa Ana* v. *Santa Ana Val. Irr. Co.* (1912) 163 Cal. 211 [124 P. 847]. There, Ross, a landowner, conveyed various parcels of contiguous property on either side of an existing road by means of deeds which reserved a 25-foot strip measured from the center line of the road "for road purposes." (*Id.* at pp. 215-216.) The road as it existed both before and after the conveyances took up only a portion of the 50-foot strip created by the series of deeds. After

---

[5] Several of the parties have expressed concern as to the nature of the dedicated interest if Casa de Roca Way is determined to be a "public" but not "county" road. Such questions are raised most often in the context of inquiring who is responsible for maintaining the road if not the County.

We agree with the suggestion implicit in these concerns that acceptance of an implied offer of dedication by public use does not vest fee title in some amorphous "public" which is then responsible for maintenance. At most, acceptance by public use can result in an easement in favor of the public for road purposes. Under such circumstances, fee title must continue to be held by some private person or persons.

The issues of who holds fee title to the 50-foot strip and who is responsible for maintaining the road were not resolved by the trial court and are not before us on this appeal. We note that in the usual case, a conveyance of property abutting a public road conveys fee title to the midpoint of the road subject to a public easement. (Civ. Code, § 1112.) Whether the Rasmussen deeds and later deeds can be construed to fit the usual case, or whether such a solution can be reached by different means, is a question we leave—at least for the time being—to the parties and the trial court.

concluding the language of the deeds reflected Ross's intent to dedicate the strip for a *public* road, the Supreme Court then quickly rejected the defendant's argument that Ross's offer of dedication was accepted only to the extent of public use: "It is hardly necessary to say that after the dedication of the strip for a public highway by Ross the use of only a portion of it for such purposes by the public shows no abandonment of the unused portion. The acceptance by user of a portion of a road dedicated is an acceptance of it in its entirety." (*Id.* at p. 219.) Other cases have applied the same principle in different contexts and reached similar conclusions. (See, e.g., *Southern Pacific R. R. Co.* v. *Ferris* (1892) 93 Cal. 263, 265 [28 P. 828] [offer of dedication of strip of land for road accepted by public use of one-half of the strip results in dedication of entire strip]; *Tischauser* v. *City of Newport Beach* (1964) 225 Cal.App.2d 138, 145 [37 Cal.Rptr. 141] [construction and use of 6-foot sidewalk accepts offer of dedication of entire 40-foot avenue].)

In support of their position, plaintiffs rely on *Robas* v. *Allison* (1956) 146 Cal.App.2d 716 [304 P.2d 163]. In *Robas,* a subdivision map recorded in 1925 showed a 20-foot strip known as "Lytle Lane" with adjoining lots on both sides of the road. The road was offered for dedication but never accepted by county authorities. Like Casa de Roca Way, the traveled portion of Lytle Lane was never as wide as the 20-foot strip marked on the map. Unlike this case, the traveled way was not confined within the 20-foot strip, instead encroaching—sometimes substantially—on the lots abutting the east side of the road. The court held that a road easement had been created over the traveled portion of Lytle Lane but that no easement existed over the portion of the 20-foot strip which did not coincide with the traveled way. The opinion explained that the offer of dedication could be accepted "by a sufficient use of the land [by the public] for [road] purpose[s]. This would apply, however, only to that part of the strip which was actually so used." (*Id.* at p. 720.)

■ For several reasons we do not believe *Robas* requires us to conclude that only the traveled portion of Casa de Roca Way was accepted as a public road. Initially, we believe the facts of *Robas* are distinguishable because the traveled way there was not confined—entirely or even substantially—within the strip offered for dedication.[6] The inference that public use constitutes acceptance of an offer of dedication is dependent in large part on the fact that the public is using the piece of property offered.

Even if *Robas* were not distinguishable, we are compelled to follow *Santa Ana* and the other cases which reach a contrary result. To begin with, the

---

[6]In their petition for rehearing, plaintiffs point out that the traveled way in this case lies outside the 50-foot strip at at least one point opposite the Harding property, encroaching slightly on the property owned by Jensen. (See appendix C.)

*Santa Ana* and *Southern Pacific* were decided by the Supreme Court and we are thus jurisdictionally bound to follow them. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Moreover, *Robas* fails to either cite authority in support of its proffered rule or acknowledge and distinguish the contrary line of authorities represented by *Santa Ana* and *Southern Pacific*. Under these circumstances, *Robas* provides an inadequate basis to support plaintiffs' argument. ■ Consistent with Supreme Court authority, we hold that public use of a narrower traveled way running entirely within the 50-foot strip offered for dedication by Rasmussen resulted in acceptance of Rasmussen's offer as to the entire 50-foot strip.

## II

### Adverse Possession

■ After concluding that Casa de Roca Way was a private road, the trial court determined that each of the plaintiffs obtained title to portions of the road by adverse possession. We now must examine that determination in light of our conclusion that Casa de Roca Way is a public road.

The parties agree that Civil Code section 1007 is dispositive of plaintiffs' adverse possession claim. They disagree on what result is compelled by the statute. The section provides in relevant part: "[N]o possession by any person . . . no matter how long continued of any land, . . . easement, or other property whatsoever dedicated to . . . or owned by the state or any public entity, shall ever ripen into any title, interest or right against the owner thereof." Plaintiffs argue that the statute by its terms applies only to property dedicated to or owned by a *public entity*. They assert that an easement owned by the "public" in general—rather than any particular public entity—is subject to being taken by adverse possession.

We think plaintiffs' argument depends on an excessively wooden construction of the statute. As we read the basis for the statute, the reason for prohibiting adverse possession of public property is because there may be little incentive for a public entity to be aware of who is using public property or take steps to interfere with a potential adverse possessor. (See generally *People* v. *Banning Co.* (1914) 167 Cal. 643, 648 [140 P. 587] [use of state lands by private persons is deemed a permissive use acquiesced in by the state].) If that is the case, there is even less incentive where the property or interest is owned by the "public" in general rather than some governmental entity. For the purposes of this statute, we believe "public entity" includes the "public" at large.

Plaintiffs assert that even if adverse possession is unavailable, their pleadings in the trial court alleged theories of abandonment and estoppel which the trial court found it unnecessary to rule on and which they are entitled to present and have determined. While the merit of such a claim on this record seems questionable (see *City of Sacramento* v. *Jensen* (1956) 146 Cal.App.2d 114, 122-123 [303 P.2d 549]), we cannot presume what facts plaintiffs might be able to present to substantiate their claim. Accordingly, the matter must be remanded for a determination of this issue as well as any additional questions the court reserved for later resolution.[7]

## III

### *Establishment of a Valid Pre-1929 Subdivision*

In the eleventh cause of action in his cross-complaint, Vanek sought declaratory relief that he need not comply with current subdivision requirements because his property was validly subdivided by Neil Rasmussen in 1926. To substantiate this contention, Vanek proffered two distinct theories. First, he sought to prove by circumstantial evidence that Rasmussen filed and recorded a valid subdivision map in 1926 which had subdivided Vanek's 40 acres into approximately 630 parcels, all of which he can now sell separately. Alternatively, Vanek argued that Rasmussen created a valid "metes and bounds" subdivision in 1926 which exempted him and all later owners from the requirements of subdivision legislation passed in 1929 and later years.

The trial court determined to try Vanek's eleventh cause of action first.[8] Following Vanek's opening statement, however, the court granted the County's motion for a nonsuit. Under well established standards, such a ruling was proper only if the trial court could assume Vanek would prove his proffered case and nonetheless conclude he was not entitled to judgment. Determination of a motion for nonsuit requires that the court

---

[7] We do not view the trial court judgment as establishing—nor do we intend by our reversal of that judgment to negate—any prescriptive rights which may have been acquired in portions of the traveled way which exceed the 50-foot strip and encroach on the property of adjacent landowners. (See *ante*, fn. 6) The existence and extent of any such prescriptive rights remains a question to be resolved by the trial court.

[8] In a somewhat cryptic reference, Vanek argues that the court's decision to hear Vanek's eleventh cause of action first resulted in placing an improper affirmative burden on him with regard to the issue of whether the road was "public." We suspect that to the extent Vanek's lost subdivision map theory constitutes a defense to the underlying quiet title action, it is properly viewed as an affirmative defense on which Vanek would bear the burden of proof. In any event, because the subdivision issue was resolved as a matter of law in the motion for nonsuit, the burden of proving facts was never a relevant issue. Accordingly, no prejudice resulted.

indulge every legitimate inference in favor of the plaintiff or cross-complainant. (E.g., *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; *Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 867-868 [86 Cal.Rptr. 359].) The evidence offered in the opening statement must, however, be substantial evidence sufficient to support a judgment. (See *O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729, 746 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 410, p. 413.)

Based on Vanek's opening statement, the most favorable view of the facts would appear to be as follows: In 1926, a valid subdivision could be created in one of two ways. The developer could file with the county recorder a legal subdivision map as specified in the 1907 Subdivision Map Act (Stats. 1907, ch. 231, p. 290) and sell lots by reference to the map. Alternatively, the developer could stake out a subdivision and sell lots by "metes and bounds" descriptions rather than by reference to a map. The evidence showed that in creating the Shady Brook subdivision, Rasmussen relied on an "Arbitrary Office Map" which depicted the numerous 25- by 110-foot lots and also showed a meandering 50-foot strip within which the dirt road now known as Casa de Roca Way ran. Assessor's Map No. 23, recorded and certified in 1932, was obviously taken from the Arbitrary Office Map. Vanek attempted to draw an inference from these facts that the county assessor relied on a properly prepared and recorded but since destroyed subdivision map in creating Assessor's Map No. 23.

It was undisputed that prior to 1929, Rasmussen sold lots in the staked out Shady Brook subdivision using metes and bounds descriptions. Vanek's second theory relies on this fact and an interpretation of a "grandfather" clause in the 1929 Subdivision Map Act (Stats. 1929, ch. 837, § 1, p. 1791) to suggest that Rasmussen's staking out of the "metes and bounds" subdivision exempted all of Rasmussen's successors in interest from compliance with later Subdivision Map Acts. It was also undisputed, however, that the 40 acres which Vanek now owns was never conveyed as other than a single parcel.

■ While the inference is far from compelling, we assume for the purposes of argument that from these facts it could be inferred Rasmussen filed with the County prior to 1929 a subdivision map, since lost or destroyed, containing the information now found on assessor's map No. 23. Even if such a dubious inference is indulged, Vanek's case is legally insufficient. As the County points out, the 1907 Subdivision Map Act and an applicable 1914 county ordinance prescribed various requirements for a filed subdivision map including a designation of lots by letter or number and boundaries, a certification by all owners as to title and the county auditor as

to tax liens, an endorsement by the owners of new lands dedicated to public use, and an identification of public streets and highways to abut each parcel. It is undisputed that assessor's map No. 23 contains none of this information. Accordingly, in our view, the existence of assessor's map No. 23 does not allow a legitimate inference that a proper and complete subdivision map was filed by Rasmussen before 1929.

An independent reason to reject Vanek's position is provided by our interpretation of the 1929 Subdivision Map Act. That act for the first time required the filing of a subdivision map in order to create a legal subdivision. It also, however, created an exemption from the act's requirements for "any subdivision of land which has been staked out and in which sales or contracts of sale have actually been made prior to the adoption of this act, or [for] any subdivision a map of which has been duly recorded under the provisions of any previous act . . . ." (Stats. 1929, ch. 837, § 1, p. 1791.) Thus, if the developer had complied with the earlier 1907 act, the mere recording of the subdivision map served to "grandfather" the subdivision and exempt it from the more stringent requirements of the 1929 act. If, however, the developer was creating a "metes and bounds" subdivision without the benefit of a subdivision map, it would only be exempt if lots within the subdivision had been sold or if contracts for sale of those lots had been entered into prior to the effective date of the act.

Vanek takes the position that regardless of whether Shady Brook is considered to have been created by a valid subdivision map or instead is simply a "metes and bounds" subdivision, the 1929 act creates an exemption which allows any successor in interest to sell portions of his property as small as the 25- by 110-foot lots staked out by Rasmussen without complying with later Subdivision Map Act requirements. We find this position untenable.

The purposes underlying the various enactments of the Subdivision Map Act have been to control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general. (See *Pratt v. Adams* (1964) 229 Cal.App.2d 602, 605-606 [40 Cal.Rptr. 505].) The clear purpose of the so-called "grandfather" clause is to protect developers who have detrimentally relied on an earlier state of the law. That purpose is hardly served by allowing later purchasers of property which has never been sold in subdivided form to take advantage of an exemption. In such cases, the later purchaser placed no reliance on the prior state of the law. On the other hand, the salutary purposes served by the Subdivision Map Act would be frustrated if a simple staking out and selling of a handful of parcels in the late 1920's could exempt all land in the subdivision 60 years and several owners later from any subdivision

regulatory requirements. In simple terms, the purpose of the statutory exemption does not support a conclusion that it runs with the land.

Similar reasoning defeats Vanek's argument regardless of whether he relies on the theory of a lost subdivision map or on the "grandfathering" of a "metes and bounds" subdivision. Because the issue is properly resolvable as a matter of law, the trial court did not err in granting the County's motion for nonsuit as to Vanek's eleventh cause of action.

## IV, V*

. . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. The order dissolving the injunctions is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion. Except for the County, which is entitled to its costs from the cross-complainants, the parties shall bear their respective costs for this appeal.

Huffman, J., and Nares, J., concurred.

A petition for a rehearing was denied December 27, 1989, and respondents' petition for review by the Supreme Court was denied February 21, 1990.

* See footnote, *ante,* page 271.