[No. B004202. Second Dist., Div. Six. Nov. 9, 1984.]

JOHN TAFT CORPORATION, Plaintiff and Respondent, v.
ADVISORY AGENCY FOR THE COUNTY OF VENTURA,
Defendant and Appellant;
COUNTY OF VENTURA, Real Party in Interest and Appellant.

## COUNSEL

Dorothy L. Schechter, County Counsel, and Andrew B. Gustafson, Assistant County Counsel, for Defendant and Appellant and for Real Party in Interest and Appellant.

Kenneth L. Nelson, County Counsel, and Rosanne J. Coit, Deputy County Counsel, as Amici Curiae on behalf of Real Party in Interest and Appellant.

Stanley E. Cohen, Robert B. England, Mitchel B. Kahn and Cohen, England & Whitfield for Plaintiff and Respondent.

OPINION

GILBERT, J.—We here determine that the United States Government Survey Maps prepared and recorded pursuant to federal law do not constitute subdivisions of land within the meaning of the California Subdivision Map Act. (Gov. Code, §§ 66410-66499.37.)

The Advisory Agency for the County of Ventura and the County of Ventura (referred to collectively as the County) appeal from a writ of mandate directing the County to release the notice of intention to record a notice of violation (Gov. Code, § 66499.36)[1] which it recorded February 2, 1983, on two lots transferred by John Taft Corporation (Taft) to Charles and Helen Willett. We conclude that Taft's conveyances of these two lots without prior County approval, while retaining the balance of its contiguous land, violated section 66499.30, subdivision (b) of the Subdivision Map Act (the Map Act) and Ventura County Ordinance Code section 8211. We therefore reverse the trial court's order.

FACTS

The facts are undisputed. On June 26, 1878, the two lots in question were public lands owned by the United States of America (United States). On that date a United States Government Survey Map (U.S. Survey Map), prepared according to federal statutes governing the survey and subdivision of public lands (formerly Rev. Stat., § 2395 et seq., now 43 U.S.C. § 751 et seq.), was approved and filed in the office of the U.S. Surveyor General for the State of California. The U.S. Survey Map outlined and identified, among other things, lots 1, 2 and 3 of section 21 in Township 4 North, Range 22 West, San Bernardino Meridian in California. The boundary lines between lots 1 and 2 and between lots 2 and 3, respectively, were administratively drawn on the U.S. Survey Map and they do not represent lines actually run or surveyed.

On June 22, 1895, James A. Gibson, Jr., received a patent to over 140 acres of land which included lots 1, 2 and 3 in section 21. The patent constituted a grant in fee for land described, in pertinent part, as "[l]ots numbered one, two and three of Section twenty-one . . . in Township Four North of Range twenty-two West of San Bernardino Meridian in California . . . according to the Official Plat Of The Survey Of Said Lands, returned to the General Land Office by the Surveyor General, . . ."

---

[1]All references hereinafter are to the Government Code unless otherwise specified.

The trial court found that descriptions of the parcels which the patent conveyed to James Gibson were determined according to the U.S. Survey Map, rather than according to the acreage description. The court further concluded that this conveyance was a "subdivision" by the United States of the real property into the separate and distinct parcels described in the patent pursuant to the federal statutes governing the survey, subdivision and sale of public lands. It was not subject to any then-existing California statutes regulating the subdivision of land, or to any local ordinances enacted pursuant thereto.

On May 5, 1965, Taft acquired title to lots 1 and 2 and a portion of lot 3. Each conveyance in the chain of title running from the United States to Taft had been accomplished by a single instrument which separately identified, but did not divide ownership of lots 1, 2 and 3 of section 21. On July 6, 1971, Taft acquired an additional 20-acre parcel of land contiguous to the southern border of the portion of lot 3 which it already owned. It then owned lot 1 of approximately 47.25 acres, lot 2 of approximately 43.75 acres, a portion of lot 3 containing approximately 27.10 acres and the additional 20-acre parcel.

Effective February 25, 1972, the County enacted an ordinance which altered the zoning and specified a minimum parcel size of 40 acres. Taft concedes that the 27.10-acre portion of lot 3 which it owned was thereby merged with the newly acquired contiguous 20-acre parcel. The County acknowledges that if each of the three lots was a separate and distinct parcel under the Map Act immediately prior to passage of its ordinance, that would be the only merger of Taft land resulting from the ordinance.

By separate grant deeds dated March 6 and July 1, 1980, respectively, and recorded in Ventura County, Taft conveyed first lot 1 and then lot 2 to the Willetts. The County had never approved any final map or parcel map respecting the Taft acreage, or any portion of it, and had never granted any approval for its subdivision. On February 2, 1983, the County filed its notice of intention to record a notice of violation. (§ 66499.36.)

The County Advisory Agency conducted hearings on April 20, 1983, with respect to these lots. Based on the evidence adduced at these hearings, the Ventura Resource Management Agency then determined (1) that the 20-acre parcel and lots 1, 2 and 3 (which it treated as a single parcel) "ceased to exist as two separate lots and merged into a single lot as of February 25, 1972," and (2) that the conveyances of lots 1 and 2 constituted illegal land divisions in violation of the Map Act and local ordinances.

The trial judge concluded that this decision was erroneous because on February 25, 1972, Taft owned lot 1, lot 2, and the merged lot 3 as separate and distinct parcels which had been created pursuant to federal statutes

regulating the subdivision of public land owned by the United States. The lots were not subject to any then-existing California laws regulating the division of land, or to any local ordinances enacted pursuant thereto at the time of their creation, and they were not deemed merged solely because they had continued to be held by a single owner. Since they conformed to the minimum parcel sizes established by the County zoning ordinance, no further proceedings under the Map Act or County ordinances were required, and Taft's conveyances of the two lots did not constitute illegal subdivisions. (§§ 66424.2, subd. (a), 66499.30, subd. (d).) Therefore, the trial court ordered that a writ of mandate issue to procure the release of the notice of intention filed by the County.

## DISCUSSION

■■■ The County contends that the trial judge erred in concluding that the original lots 1, 2 and 3 held by Taft constituted separate and distinct parcels of land which were created prior to the Map Act and therefore were not subject to its provisions, or to County ordinances.

Taft retained the balance of the contiguous land it owned and did not file a parcel map at the time of the 1980 conveyances. Therefore, unless the conveyances were exempt because the lots were established as separate parcels by the U.S. Survey Map filed in 1878, each conveyance constituted an illegal subdivision by Taft. If, on the other hand, these were separate contiguous parcels legally created prior to the effective date of the Map Act, they would not be deemed merged simply because they were held or acquired by a single owner, even if viewed as a single parcel by the County assessor. (§ 66451.10, formerly § 66424.2, subd. (a); 59 Ops.Cal.Atty. Gen. 581 (1976).)

The County concedes that lots 1 and 2 are "legal subdivisions" within the meaning of the federal survey law and that in California the Map Act exempts "established subdivisions." It argues, however, that the conveyances of these lots to the Willetts are not exempt from the Map Act because the word "subdivision" has a different meaning there than it does in the federal survey law.

We concur that the term "legal subdivision" as used in the federal survey law refers neither to a physical division of land nor to the allocation of a parcel to more than one owner. The term there refers instead solely to a survey method adopted to facilitate the conveyance of public land to one or more owners by establishing the geographic location of the land on a descriptive map.

The U.S. Survey Map was prepared pursuant to the federal survey law which was enacted to provide a common method of property description. "One of the objects of the manual and law was to simplify the mode of disposing of the public lands, so that without cumbering patents with descriptive fieldnotes, the plats of the surveys should afford all necessary information to purchasers, and at the same time afford a convenient and certain description by reference of the land conveyed; and these official plats are made the basis of all sales and selections of the public lands, and are solely referred to in the usual patents to show what lands are patented." (*Chapman* v. *Polack* (1886) 70 Cal. 487, 494 [11 P. 764].)

After California became a part of the United States in 1848 all of its public lands—those not encompassed by the boundaries of a pueblo or a Spanish or Mexican land grant—were surveyed utilizing the system prescribed by the federal survey law. (See 1 Ogden, Revised Cal. Real Property Law (Cont.Ed.Bar 1974) § 14.4, pp. 588-593; 43 U.S.C. § 751 et seq.)[2] The survey established a grid system oriented to north and south meridians and utilized six-mile square townships as its basic building blocks.

The townships are divided into 36 sections, each theoretically 1 mile square. Monuments mark section corners and the midpoints between them (quarter corners) which may be used to divide the sections into quarter sections or smaller units. Due to the earth's curvature the meridians converge at the poles and the northern boundaries of the townships are narrower than the southern boundaries. The deficiency (or excess) is apportioned to quarter-quarter sections on the north and west sides of the section. (43 U.S.C. § 751.) The quarter sections in these areas are further divided into half-quarter sections of 80 acres each along the interior edges of each section, which are then divided into "lots" or "fractional quarters" of a quarter, approximately 40 acres each. (43 U.S.C. § 752.)

This public land survey system permits size adjustments in dimensions of the lots along the edges of the uneven sections and also at the uneven boundary lines of the unsurveyed Spanish or Mexican land grants. (*Robert P. Kunkel* (1967) 74 Interior Dec. 373, 375.) For example, lots 1, 2, and 3 of section 21 were formed where the northern part of that section adjoins the Mexican land grant known as the Ojai Rancho, and the boundary lines between these lots were merely drawn in the surveyor's office. After completion of the survey, the United States was able to describe public lands for purposes of conveyance in units referred to as "legal subdivisions." An instrument conveying an interest in federal lands to a private party must,

---

[2]This survey system is outlined in the federal statutes and further described in the U.S. Bureau of Land Management, Manual of Surveying Instructions (1947).

whenever possible, describe the land being conveyed by reference to these "legal subdivisions." (*Id.,* at p. 374.)

The County argues that the Map Act is to be liberally construed to implement high standards for orderly community development and to bring under its umbrella as many transfers or conveyances of land as possible in order to facilitate local regulation of the design and improvement of subdivisions. (*Bright* v. *Board of Supervisors* (1977) 66 Cal.App.3d 191, 195-196 [135 Cal.Rptr. 758]; *Soderling* v. *City of Santa Monica* (1983) 142 Cal.App.3d 501, 506 [190 Cal.Rptr. 140].) ■ The salutary purposes of the Map Act include, among other things, a determination of the compatibility of design of a subdivision in relation to surrounding land, the requirement for installation of streets and drains, and the prevention of fraud and exploitation of the public and purchasers. (*Pratt* v. *Adams* (1964) 229 Cal.App.2d 602, 605-606 [40 Cal.Rptr. 505].)

The Map Act regulates the manner in which an owner of a contiguous block of land may "subdivide" or convey a portion of land while retaining the balance. Section 66424 provides, in pertinent part: "'Subdivision' means the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale. . . ." Subdivision under the Map Act may be lawfully accomplished only by obtaining local approval and recording a final map (§ 66426 relating generally to five or more parcels) or a parcel map (§ 66428 relating to the creation of four or fewer parcels) with the county recorder (§§ 66411.1, 66468).

The Map Act prohibits the sale of any parcels of real property for which a map is required, until a map in full compliance with its provisions has been filed for record. (§ 66499.30, subd. (b).) Section 66499.30, subdivision (d) exempts certain property transfers as follows: "This section does not apply to any parcel or parcels of a subdivision . . . exempt from any law . . . regulating the design and improvement of subdivisions in effect at the time the subdivision was *established.*" (Italics added.)

In addition section 66451.10 (formerly § 66424.2) has provided throughout this litigation, in pertinent part, that: "[T]wo or more contiguous parcels . . . which have been created under the provisions of this division or any prior law regulating the division of land or a local ordinance enacted pur-

suant thereto or *were not subject to such provisions at the time of their creation* shall not be deemed merged by virtue of the fact that such contiguous parcels . . . are held by the same owner, and no further proceedings under the provisions of this division or local ordinance enacted pursuant thereto shall be required for the purpose of sale, . . . of such contiguous parcels . . . or any of them . . . ." (Italics added.)

▮▮▮ We therefore focus on the question whether the U.S. Survey Map "established" a "subdivision" which "created" lots 1, 2 and 3 as "lawful parcels" which were exempt within the meaning of sections 66424.2 and 66499.30, subdivision (d) of the Map Act. Section 66412.7, enacted in 1980, provides that "[a] subdivision shall be deemed established" on the date the required map is recorded; if a subdivision is exempted from map requirements, it is established when the application for a certificate of exemption is filed with the local agency. The Legislature thus places significance on subdivision map recordation and local agency control. We are guided by this legislative intent.

The County emphasizes that the local agency may impose conditions requiring the completion of designated improvements which are certified on the face of the subdivision map. The map, when recorded, gives constructive notice to transferees. (§§ 66411.1, 66468.) Because it is recorded locally in the chain of title, it also partakes of the qualifications of a conveyance. (Civ. Code, § 1215; *Stearns* v. *Title Ins. & Trust Co.* (1971) 18 Cal.App.3d 162 [95 Cal.Rptr. 682].) This is not true of a record of survey or the U.S. Survey Map. "The recordation of United States Government Surveys by the Department of Interior is provided for by section 751 of title 43 of the United States Code. The statute, however, does not provide for constructive notice." (*Id.,* at p. 169.)

Federal statutes provide for recordation of the U.S. Survey Map at the office of the U.S. Surveyor General (43 U.S.C. § 751) rather than the local office of the County recorder. Furthermore, the term "legal subdivision" may be applied to any unit smaller than a section which is an "aliquot" part of the section based on the quadrant even if that unit is not actually depicted on the U.S. Survey Map. (*Jacob N. Wasserman* (1967) 74 Interior Dec. 392.) The Map Act specifically requires a parcel map for divisions of quarter-quarter sections or other small units (§§ 66426, 66426, subdivision (d).) Therefore, the "legal subdivisions" referred to by the federal survey laws have not been "established" within the meaning of the Map Act. Had the Legislature intended to exempt such units of land from the Map Act, a

specific exemption from the "subdivision" definition of section 66424 could have been provided.

California judicial authorities do not treat the filing of the U.S. Survey Map as though this established "subdivisions" of land which would obviate the need for compliance with the Map Act at the time of a later title transfer. Taft relies on language in cases such as *Verdi Dev. Co.* v. *Dono-Han Mining Co.* (1956) 141 Cal.App.2d 149, at page 152 [296 P.2d 429] that, "[a] survey of public lands does not *ascertain* boundaries, it *creates* them." (Italics in original.) The boundaries have no existence until ". . . all conditions as to filing in the proper land office and all requirements as to approval have been complied with, . . ." (*Cox* v. *Hart* (1922) 260 U.S. 427, 436 [67 L.Ed. 332, 338, 43 S.Ct. 154].) Similarly, the California Supreme Court has held that there is no described tract of land "'. . . until it has been located within the congressional township, by an actual survey and establishment of the lines, under the authority of the United States, and the survey has been approved by the proper United States surveyor-general.'" (*Bullock* v. *Rouse* (1889) 81 Cal. 590, 594-595 [22 P. 919].) Consequently, where a deed refers to a map marking the boundaries of the land conveyed, the map must be regarded as providing the true description of the land. (*Chapman* v. *Polack, supra,* 70 Cal. 487, 495.)

These cases, however, hold not that the U.S. Survey Map established "subdivisions," but that it supplied monuments and lines essential for the description of property which might be subdivided or conveyed in the future. By contrast, cases arising under the Subdivided Lands Act (Bus. & Prof. Code, §§ 11000-11200), which serves a purpose similar to the Map Act, are instructive. The appellate courts have there concluded that conveyances of lots depicted on a U.S. Survey Map are not exempt from statutory regulation since that map does not "subdivide" the property for purposes of the Subdivided Lands Act. (*Cowell* v. *Clark* (1940) 37 Cal.App.2d 255 [99 P.2d 594]; *People* v. *Byers* (1979) 90 Cal.App.3d 140 [153 Cal.Rptr. 249].)

We conclude that the trial court erred in its determination that lots 1, 2 and 3 constituted separate and distinct parcels of land which were legally subdivided within the meaning of the Map Act by the prior U.S. Survey Map and which were, therefore, exempt from regulation under the Map Act and local ordinances. Because the lots were not legal subdivisions prior to the Map Act, no merger issue is raised by Taft's ownership of the entire parcel. Consequently, Taft's conveyances of lots 1 and 2 were properly determined by the Ventura Resource Management Agency to be illegal land divisions in violation of the Map Act and local ordinances and the notice of violation was not improperly recorded.

The writ of mandate is reversed.

Stone, P. J., and Abbe, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 23, 1985.