94 Cal.Rptr.2d 97 (2000)
79 Cal.App.4th 194
CIRCLE K RANCH CORP., Plaintiff and Appellant,
v.
BOARD OF SUPERVISORS of the County of Santa Barbara, Defendant and Respondent.
No. B124996.
Court of Appeal, Second District, Division Six.
March 21, 2000.
Review Denied June 21, 2000.[*]
*99 John Kenneth Dorwin, Buellton, for Plaintiff and Appellant.
June Babiracki Barlow, General Counsel, and Neil D. Kalin, Assistant General Counsel, for California Association of Realtors as Amici Curiae on behalf of Plaintiff and Appellant.
Andre, Morris & Buttery, Dennis D. Law, Mary E. McAlister, San Luis Obispo; Diane M. Matsinger; McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., and Marie A. Cooper, Walnut Creek, for Weyrich Development Co. as Amici Curiae on behalf of Plaintiff and Appellant.
James S. Burling, Sacramento, and John A. Ramirez for Pacific Legal Foundation as Amici Curiae on behalf of Plaintiff and Appellant.
Stephen Shane Stark, County Counsel, and Alan L. Seltzer, Chief Deputy, County of Santa Barbara, for Defendant and Respondent.
Miller, Starr & Regalia, Arthur F. Coon and Christian Carrigan, Walnut Creek, for California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant attorney General, Peter H. Kaufman, Supervising Deputy Attorney General and Jamee Jordan Patterson, Deputy Attorney General for California Coastal Commission as Amici Curiae on behalf of Defendant and Respondent.
James B. Lindholm, Jr., County Counsel, Patrick Foran and Raymond A. Biering, Deputies County Counsel, for County of San Luis Obispo as Amici Curiae on behalf of Defendant and Respondent.
*98 GILBERT, P.J.
A property owner suggests this case presents an opportunity to decide the question left unanswered by Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 29 Cal.Rptr.2d 804, 872 P.2d 143. What is the legal status of subdivisions created on paper prior to the state's first subdivision law in 1893, but never sold or leased as separate parcels? Such subdivisions have been described as "the legacies of 19th century would-be developers whose dreams of carving up their land into profitable real estate parcels went only as far as the county recorder's office." (Id., at p. 765, 29 Cal.Rptr.2d 804, 872 P.2d 143 (conc. opn. of Mosk, J.).)
The parcel in question here, however, was not the past dream of a 19th century would-be developer. It is the recent dream of a late 20th century property owner. The property owner seeks to use a United States government survey line appearing on old maps as a boundary line to divide his parcel.
The property owner appeals the trial court's denial of a petition for writ of mandate, administrative mandate, and declaratory relief. The property owner seeks to compel the county to issue a certificate of compliance with the Subdivision Map Act for a parcel based on the survey line. (Gov.Code, § 66499.35 et seq.)[1] We affirm the judgment of the trial court.

FACTS
The Circle K Ranch Corp. ("Circle K") owns a large parcel of property in the Santa Ynez Valley of Santa Barbara County. The deed from which Circle K derives its title described the property as portions of Rancho Canada de Los Pinos ("Rancho Canada"). The deed uses metes and bounds to describe an irregularly shaped parcel.
A privately prepared map of Rancho Canada was recorded in 1888. The map depicts United States government survey lines. Because the government survey does not extend to Spanish land grants, these lines were added by extending official survey lines from outside Rancho Canada. Townships and sections are labeled on the map. Although a portion of the *100 1888 map shows land divided into lots, Circle K's parcel is located outside that area. In fact, nothing on the map delineates Circle K's parcel.
The portion of Circle K's property for which it seeks a certificate of compliance is delineated by laying the metes and bounds description from Circle K's deed over the government survey drawn on the 1888 map. Circle K seeks to use a township line designated on the map as a boundary to separate a portion of its parcel lying north of the line from the larger portion of its parcel lying south of the line.
Circle K's proposed legal description provides in part: "All that portion of that certain quitclaim deed from Betty Kessler to Circle K Ranch Corp., recorded as Instrument Number XX-XXXXXX, Official Records of said County on November 16, 1990 that lies North of the South line of Section 30, Township 7 North, Range 29 West, S.B.M. as said Section is shown on [1888] subdivision map...."
The result is a 36-acre parcel roughly shaped like a triangle, with a smooth southern boundary formed by a township line, and irregularly shaped sides formed by the metes and bounds description of Circle K's deed. (See Appendix A.)
In addition to the 1888 map of Rancho Canada, Circle K relies on official maps of Santa Barbara County. The first such official map was adopted by the board of supervisors in 1889. It arose out of a contract to make a map "for the use of the Assessor's office." In 1909, the county adopted a new map to replace the 1889 official map. Both maps are of the entire county and show United States government survey lines extending into Rancho Canada. The county adopted a new official map in 1937. The 1937 map shows the entire county but does not show United States government survey lines extending into Rancho Canada. None of the maps delineate any portion of the parcel as described in Circle K's deed.
In denying Circle K's application for a certificate of compliance, the board of supervisors found, among other matters, that the survey line defining the southern boundary of the proposed parcel has never been used as a boundary of any parcel, and that the proposed parcel has never been conveyed separately from the entire parcel.

DISCUSSION

I
In Morehart v. County of Santa Barbara, supra, 7 Cal.4th 725, 29 Cal.Rptr.2d 804, 872 P.2d 143, the county passed ordinances providing for the merger of contiguous parcels owned by the same party where necessary to comply with the county's requirement for a minimum lot size. The Moreharts owned a parcel of property for which a subdivision map had been filed in 1888, prior to the first subdivision map statute. The subdivision had never been developed. The Moreharts applied for a development permit for one of the lots in the paper subdivision. The lot size was less than the minimum allowed for development. The Moreharts challenged the county merger ordinances as being preempted by the merger provisions of the Subdivision Map Act. (§§ 66451.10-66451.21.) In answering the Moreharts' complaint the county admitted the lot for which the Moreharts were seeking a development permit was created by the antiquated subdivision map. (Morehart, supra, at pp. 760-761, 29 Cal.Rptr.2d 804, 872 P.2d 143.)
Our Supreme Court ultimately concluded that the county's ordinances were preempted by the Subdivision Map Act. But because the county conceded the lot in question exists the court did not consider "`... any of the prerequisites to creation of a parcel that preceded California's first subdivision map statute in 1893...."' (Morehart v. County of Santa Barbara, supra, at p. 761, 29 Cal.Rptr.2d 804, 872 P.2d 143.)
*101 The question posed but unanswered by Morehart is an important one. A report of the California Senate Committee on Local Government estimates that there are between 133,000 and 424,000 lots in "antiquated subdivisions." (Sen. Com. on Local Government, Summary Rep. from the Interim Hearing of the Subcommittee on the Redevelopment of Antiquated Subdivisions (Dec. 2, 1986) p. 19.) Some of the lots are as small as one twenty-fifth of an acre. (Ibid.) Some of the subdivisions are laid out without regard to topography or geography. (Ibid.)
Circle K and a number of amici curiae suggest the only prerequisite to the creation of a parcel prior to the first subdivision map statute in 1893 is the recordation of a subdivision map. But the purpose of the recording act is to protect bona fide purchasers. (Seeger v. Odell (1941) 18 Cal.2d 409, 415, 115 P.2d 977.) It is not the purpose of the recording act to allow a landowner to create in himself a legally recognized interest in his own land. The act of recording alone does not create a subdivision of land without an actual transfer.
It is true that the recordation of a map outlining an intended subdivision could serve as an implied revocable offer to dedicate public streets. (See McKinney v. Ruderman (1962) 203 Cal.App.2d 109, 115-117, 21 Cal.Rptr. 263.) But such a revocable offer to dedicate cannot reasonably be construed as by itself creating a subdivision. In spite of a recorded subdivision map, a landowner was free to divide and transfer his property as he pleased. (See Hayward v. Manzer (1886) 70 Cal. 476, 13 P. 141 [where a city had done nothing to indicate acceptance of implied offer to dedicate, landowner had marketable title to land designated for public street on recorded tract map].)
There is no authority to support the proposition that the recording of a subdivision map was alone sufficient to constitute a legally recognizable subdivision lot. Prior to statutes regulating the subdivision of land no one would even have standing to challenge whatever division of his own land a landowner cared to make. The number of lots into which a tract could be divided was a matter completely within the discretion of the landowner. (Delano v. Jacoby (1892) 96 Cal. 275, 283, 31 P. 290.) The concept that a subdivision parcel can be created without an actual transfer is entirely a creature of modern land use regulation. We can only conclude that prior to statutes regulating subdivisions, there was no subdivision prior to the time an actual transfer took place.
Nor does the current Subdivision Map Act validate pre-1893 maps. Circle K and its supporting amici point to sections 66499.30, subdivision (d), and 66412.7 as containing "grandfather" provisions.
Section 66499.30, subdivision (d), provides that the prohibition on the sale, lease, financing, construction on or occupancy of parcels not complying with the Act does "not apply to any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or exempt from any law (including a local ordinance), regulating the design and improvement of subdivisions in effect at the time the subdivision was established."
Section 66412.7 defines the time a subdivision is established. It provides in part, "A subdivision shall be deemed established ... on the date of recordation of the final map or parcel map...." But the terms "final map" and "parcel map" refer to maps filed pursuant to the Subdivision Map Act. (§§ 66456 et seq.; 66463 et seq.) The terms have no meaning apart from the Subdivision Map Act. Sections 66499.30, subdivision (d), and 66412.7 have no bearing on maps filed prior to the Act.
Circle K also relies on section 66499.35, subdivision (d). That subdivision provides, "A recorded final map, parcel map, official map, or an approved certificate of exception shall constitute a certificate of compliance *102 with respect to the parcels of real property described therein." Circle K posits that the official maps adopted by Santa Barbara County in 1889 and 1909 qualify under the subdivision.
But those maps were prepared for assessment purposes. A certificate of compliance means that the parcel complies with the Subdivision Map Act and local ordinances enacted pursuant thereto. (§ 66499.35, subd. (a).) It makes no sense to say that any map prepared by a city or a county for any purpose and labeled "official map" constitutes a certificate of compliance. The Legislature was clearly referring to official maps prepared pursuant to the Subdivision Map Act. (§ 66499.50 et seq.)
Circle K's reliance on an uncodified statute enacted in 1953 is also misplaced. The statute provides in part: "Any map or plat recorded or filed with the county recorder of the county in which the lands shown on said map or plat are situated prior to the first day of April, 1953, shall for all purposes be deemed to have been properly so recorded or filed and to comply with all the requirements of the laws in force at the time it was so recorded or filed, notwithstanding any defect, omission or informality in the preparation or execution of such map or plat ... and all sales or conveyances of land by reference to any such map or plat shall be valid as though said map or plat had been made certified, endorsed, acknowledged and filed in all respects in accordance with the laws in force at the time said map or plat was so recorded or filed." (Stats.1953, ch. 1551, § 1.)
The purpose of the statute is to obviate questions concerning the sufficiency of legal descriptions that refer to recorded maps. Nothing in the statute creates a subdivision of land.

II
Even if we were to conclude that prior to 1893 a recorded map is all that was necessary to create a separate parcel, Circle K would not prevail. None of the maps on which Circle K relies delineates the parcel for which it seeks a certificate of compliance.
Circle K seeks to use a United States government survey line depicted on the maps as a boundary to divide a parcel described by metes and bounds. But United States government survey lines do not by themselves subdivide property. (John Taft Corp. v. Advisory Agency (1984) 161 Cal.App.3d 749, 757, 207 Cal. Rptr. 840.) Circle K is simply seeking to create a parcel where none had existed before.
Circle K argues the county is estopped from denying it a certificate of compliance. Its argument is based on the claim that the county has accepted most of the streets shown on the 1888 subdivision map into its circulation element and road system. The 1888 map shows a subdivision, but Circle K's parcel is not part of it. It is impossible to see how the acceptance of streets shown on a subdivision map could estop the county from denying the existence of a parcel that is not related to those streets.
Circle K argues it has been denied equal protection of the law. The argument is based on the claim that some property owners received certificates of compliance prior to Morehart for lots that are similar to those for which applications for certificates are now denied.
Equal protection is satisfied if the classifications are not arbitrary, but bear a reasonable relationship to a legitimate object to be accomplished. (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 599, p. 51.) Here the administrative record contains a number of certificates of compliance issued in December of 1991. The county issued these certificates under its antiquated subdivision *103 ordinances. Our Supreme Court held the ordinances to be invalid in Morehart. It is neither unreasonable nor arbitrary for the county to stop issuing certificates under a program that the Supreme Court has declared invalid. Circle K has not been denied equal protection of the law.
The judgment is affirmed. Costs are awarded to respondent.
YEGAN, J., and COFFEE, J., concur.

APPENDIX A

NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. See California Rules of CourtRules 976 and 977).
[1] All statutory references are to Government Code unless otherwise stated.