112 Cal.Rptr.2d 386 (2001)
92 Cal.App.4th 1055
Jack A. GARDNER et al., Plaintiffs and Appellants,
v.
COUNTY OF SONOMA, Defendant and Respondent.
No. A093139.
Court of Appeal, First District, Division One.
October 11, 2001.
Review Granted January 16, 2002.
*388 Leslie R. Perry, Santa Rosa, Perry, Johnson, Murray, Anderson & Miller, Attorney for Appellants/PlaintiffsJack A. Gardner et al.
Steven M. Woodside, County Counsel, Sue A. Gallagher, Deputy County Counsel County of Sonoma, Attorney for Respondent/DefendantCounty of Sonoma.
Stephen Shane Stark, County Counsel, Alan L. Seltzer, Assistant County Counsel, County of Santa Barbara, Attorneys for Amicus CuriaeThe California State Association of Counties.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Senior Assistant Attorney General, Jamee Jordan Patterson, Deputy Attorney General, Attorneys for Amicus CuriaeCalifornia Coastal Commission.
*387 MARCHIANO, J.
In 19th century California, antiquated maps embodied the entrepreneurial hopes and financial dreams of some settlers who drew plans for vast estates of teeming subdivisions. "These subdivisions are the legacies of 19th century wouldbe developers whose dreams of carving up their land into profitable real estate parcels went only as far as the county recorder's office." (Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 765, 29 Cal. Rptr.2d 804, 872 P.2d 143 (Morehart) (cone. opn. of Mosk, J.).) Despite the bold vision of those who created them, such early subdivision mapsif drawn and recorded before 1893do not create legal parcels within the meaning of California's Subdivision Map Act (Gov.Code, § 66410 et seq.).
Appellants Jack and Jocelyn Gardner, Trustees of the Gardner Family Trust, and Lindsay and Hilary Gardner own certain lots and fragments of lots depicted on an antiquated subdivision map recorded prior to 1893, when the first California statute regulating subdivision maps took effect. (Stats. 1893, ch. 80, § 1, p. 96; see Curtin et al, California Subdivision Map Act Practice (Cont.Ed.Bar 2d ed.2001) § 1.2, pp. 2-3.) Appellants asked respondent County of Sonoma (County) to recognize their lots and lot fragments as legal parcels. The County refused to recognize the parcels as legal, and appellants sought a writ of mandate to compel the County to do so. The superior court denied appellants' writ petition.
Appellants argue that antiquated subdivision maps can create legal parcels for subdivisions despite their noncompliance with the Subdivision Map Act or any of its precursors. We disagree, and conclude that maps recorded before 1893 do not create legal parcels. Accordingly, we affirm.

I. FACTS
The history of this case begins soon after Lee's surrender at the Appomattox Court House ended the Civil War. On May 9, 1865, S.H. Greene recorded a map entitled "The Redwood Estate of S.H. Greene" with the Sonoma County Recorder. This antiquated map (hereafter "the Greene Map") purported to depict a vast subdivision surveyed the previous year by H.R. Martin and R.M. Martin. Greene's subdivision *389 consisted of almost 90 numbered rectangles, or lots, in a grid superimposed over more than a thousand acres of open land west of Sebastopol.
The Greene Map divided its lots into four different ranges, with 15-28 lots per range. Each lot was labeled with a range number and a lot number, as well as length and width measurements which appear to be precise to the one-hundredth of an acre. The Greene Map noted surveyor's compass points and the location of several monuments, such as "post in mound," "Redwood tree," and "Blackoak."
The Greene Map identified two streams, Salmon and Jonive Creeks, which flowed through the purported subdivision, but identified no other geographic features. The map identified a county road running along the southeast corner of the grid, but depicted no interior roads or other subdivision infrastructure, no easements, no drainage systems, and no access routes.
Since no subdivision map statute existed in 1865, the Greene Map was simply accepted for recording without the review and approval of any public entity, including any arm of local government.
In 1877, the Thompson Atlas Map of Sonoma County included the purported subdivision called "The Redwood Estate of S.H. Greene." Over the years numerous portions of the purported S.H. Greene subdivision were conveyed to different parties. It appears that these conveyances referred to the Greene Map to describe the property conveyed, i.e., by range and lot number, but typically supplemented the description by one based on metes and bounds.
Appellants own approximately 158 acres in the south-central portion of the purported S.H. Greene subdivision. Appellants' property consists of two full lots and portions of 10 other lots from the 90 lots depicted on the Greene Map. The property is part of a conveyance from the Greene family to Paul Bertoli in 1903, which used the Map for reference but described the conveyed property in detail using metes and bounds. Appellants ultimately came into possession of their 158 acres of the purported subdivision in 1990. The Gardners' lots today bare scant resemblance to the configuration that Greene recorded in 1865. Greene envisioned 90 distinctive rectangular lots for his paper subdivision. Appellants' lots include only fragments from ten of the original lots. The property includes steep slopes and is the subject of a timber harvest plan. It is zoned for "Resource and Rural Development."
In 1996, appellants asked the County's Permit and Resource Management Department (Department) to issue them 12 certificates of compliance with the Subdivision Map Act, pursuant to Government Code section 6499.35.[1] Such certificates would have established that appellants' 12 lots constituted legal parcels within the meaning of the Act, and thus could be sold, leased or financed. (§ 66499.30, subds.(a), (b), (c); see Merritt, Antiquated Subdivisions (CEB Land Use & Environment Forum Winter 1996) p. 40.) The Department denied appellants' request, reasoning that the Greene Map did not create legally cognizable parcels because it was recorded prior to 1893.
Appellants appealed the Department's denial to the Planning Commission (Commission). After a public hearing in November 1997, the Commission denied the appeal and affirmed the Department's determination by a vote of five to zero.
Appellants then appealed the Commission's decision to the County Board of *390 Supervisors (Board). After a public hearing in January 1998, the Board denied the appeal and upheld the Commission, also by a vote of five to zero. In so doing the Board adopted Resolution No. 98-0205, which contained detailed findings.
The Board found that "the creation of parcels by the recordation of a map is a legal consequence of the Subdivision Map Act and that therefore, only maps properly recorded under the Subdivision Map Act or ... its predecessor statutes can be deemed to create parcels." The Board further found that "the mere recordation of a map prior to 1893 cannot create parcels cognizable under the Subdivision Map Act."
The Board made more specific findings that appellants' property had been "repeatedly and consistently conveyed as a single unit of land, generally described in metes and bounds since 1903"; that none of appellants' 12 purported lots had ever been separately conveyed or separately described in a grant deed;[2] and that the Thompson Map of 1877 was adopted for "administrative purposes and served [only] as a reference tool," and did not establish parcels within the meaning of the Subdivision Map Act.
The Board noted that a primary purpose of the Subdivision Map Act was orderly community development, and that the Act "serves as a critical tool for rational local land use planning." But the Board found that "recognition of parcels drawn on antiquated maps recorded prior to the adoption of any regulation of the design and improvement of subdivisions could seriously undermine rational land use planning in the County...." The Board further found that the grid lines on the Greene Map were for the most part drawn without regard to "topography, natural resources, and community needs[,] and without community review." As a result, recognition of the parcels laid out on the 1865 Greene Map could lead to "the creation of hundreds of parcels in the area inconsistent with the land use designations and acreage limitations" of the County General Plan.
The Board concluded that "the resurrection of the 1865 [Greene] map now, a hundred and thirty-three years after its recordation, could raise serious concerns regarding the preservation of water supplies in a water scarce area, the protection of the scenic corridor, the protection of stream fisheries and other wildlife resources, and the preservation of other strong community interests in the area."
Appellants challenged the Board's ruling by a petition for writ of mandate seeking to compel the County to issue 12 certificates of compliance for their Greene Map lots. After briefing and oral argument, the trial court denied the petition, essentially ruling that the 1865 Greene Map did not create legal parcels within the meaning of the Subdivision Map Act.

II. DISCUSSION
Appellants contend that antiquated subdivision maps recorded prior to 1893, when no law regulating subdivisions was in existence, can nevertheless create legal parcels if they are sufficiently accurate, detailed, and informative. Respondents and amici curiae disagree and urge that legal recognition of such maps would wreak havoc with modern land use planning. We conclude that the legislative intent underlying the Subdivision Map Act precludes legal recognition of subdivision *391 lots in pre 1893 antiquated subdivision maps.
This is a case of first impression. Like many explorers of a new world, we set forth with a sextant and a map that, while incomplete, contains many reference points to guide us.
The first such point is the Act itself. The Subdivision Map Act "is the primary regulatory control governing the division of property in California and generally requires that a subdivider of property design the subdivision in conformity with applicable general and specific plans and to construct public improvements in connection with the subdivision." (Hill v. City of Clovis (2000) 80 Cal.App.4th 438, 445, 94 Cal.Rptr.2d 901 (Hill).)
"Among the Act's purposes are to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer. [Citations.]" (Gomes v. County of Mendocino (1995) 37 Cal.App.4th 977, 985, 44 Cal.Rptr.2d 93; see Hill, supra, 80 Cal. App.4th at p. 445, 94 Cal.Rptr.2d 901; Bright v. Board of Supervisors (1977) 66 Cal.App.3d 191, 194, 135 Cal.Rptr. 758.)
Stated another way, the Act's purposes are to "control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general. [Citation.]" (Hays v. Vanek (1989) 217 Cal.App.3d 271, 289, 266 Cal.Rptr. 856 (Hays).) In addition, "[t]he salutary purposes of the Map Act include ... a determination of the compatibility of design of a subdivision in relation to surrounding land, the requirement for installation of streets and drains, and the prevention of fraud and exploitation of the public and purchasers. [Citation.]" (John Taft Corp. v. Advisory Agency (1984) 161 Cal.App.3d 749, 755, 207 Cal.Rptr. 840 (Taft); see 2 Longtin, California Land Use (2d ed. 1987) Subdivisions, § 6.03, pp. 583-584.)
Our legal sextant focuses on several provisions of the Act pertinent to our analysis. Section 66424 defines "subdivision" as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale...." Subdivision under the Act "may be lawfully accomplished only by obtaining local approval and recording" a final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved. (Taft, supra, 161 Cal.App.3d at p. 755, 207 Cal. Rptr. 840; see 64 Ops.Cal.Atty.Gen. 549, 550 (1981).)
A final or parcel map must meet strict requirements, and approval is based on the local agency's extensive review of the proposed subdivision. The local agency takes into account such matters as land use policies, water supplies, environmental concerns, and the burden on public services. (See, e.g., §§ 66451-66451.7, 66452-66452.13, 66453-66472.1, 66473-66474.10, and 66475-66478.) There are very limited exceptions from the Map Act and its process of local review of a proposed subdivision. (See, e.g., §§ 66411, 66412; see also 2 Longtin, California Land Use, supra, § 6.11 at pp. 597-599.)
Map recordation is the key component to subdivision establishment. Generally, a subdivision is "established" within the meaning of the Act on the date the approved final or parcel map is recorded or, if the subdivision is exempted from map requirements, on the date an application *392 for a certificate of exemption is filed with the appropriate local agency. (§ 66412.7; see Taft, supra 161 Cal.App.3d at p. 756, 207 Cal.Rptr. 840.) Since 1893 neither Greene nor any successor owner has attempted to establish the Gardner portion of the property as a legal subdivision under any available law. Appellants have not brought the property within the confines of section 66412.7 which explains when a subdivision is deemed established.
Section 66499.30 of the Map Act prohibits the sale, lease or financing of any parcel subject to the final or parcel map requirement, unless an approved map in full compliance with the Act is recorded. (§ 66499.30, subds.(a), (b), (c).) The polestar is section 66499.30, subdivision (d), the Act's primary "grandfather clause," which provides for a significant exemption: "[This section does] not apply to any parcel or parcels of a subdivision ... in compliance with or exempt from any law ... regulating the design and improvement of subdivisions in effect at the time the subdivision was established." (See Gustafson, Antiquated Subdivisions: A Government Perspective (CEB Land Use & Environment Forum Winter 1996) p. 50.)
Our other reference points are three Map Act decisions which did not decide the issue before us, but provide valuable direction.
Taft involved the question whether an 1878 United States Government Survey Map created a legal subdivision within the meaning of the Map Act. The Government Survey Map depicted monuments and lot lines. The Taft court reviewed the key provisions of the Act set forth above, noting that they indicated "[t]he Legislature thus places significance on subdivision map recordation and local agency control. We are guided by this legislative intent." (Taft, supra, 161 Cal.App.3d at p. 756, 207 Cal.Rptr. 840.)
Although the federal survey laws referred to "legal subdivisions," those laws did not include numerous significant provisions of the Map Act, including recording in the office of the county recorder and the consequent constructive notice to transferees. (Taft, supra, 161 Cal.App.3d at p. 756, 207 Cal.Rptr. 840.) Also, a "federal subdivision" was defined in a way not entirely consistent with the Map Act. (Ibid.) "Therefore, the `legal subdivisions' referred to by the federal survey laws have not been `established' within the meaning of the Map Act. Had the Legislature intended to exempt such units of land from the Map Act, a specific exemption from the `subdivision' definition of section 66424 could have been provided." (Id. at pp. 756-757, 207 Cal.Rptr. 840, italics added.) The Government Survey Map did not satisfy the Map Act to establish a legal subdivision.
Morehart, supra, 7 Cal.4th 725, 29 Cal. Rptr.2d 804, 872 P.2d 143 touched upon the issue before us but did not decide it. The main substantive issue in Morehart involved the merger provisions of the Map Act (§§ 66451 .10-66451.21), which provide that contiguous parcels already created are not automatically merged by virtue of common ownership, and are subject to merger only under certain conditions.
The parcel at issue in Morehart was a lot depicted on an 1888 antiquarian subdivision map. (Morehart, supra, 7 Cal.4th at p. 732, 29 Cal.Rptr.2d 804, 872 P.2d 143.) The County of Santa Barbara (CSB) conceded that the parcel was "created" by the recordation of the 1888 map. (Id. at pp. 760-761, 29 Cal.Rptr.2d 804, 872 P.2d 143.) The Supreme Court accepted that concession and explicitly declined to decide the issue of whether a pre 1893 antiquated map "creates" a legal parcel: "Thus, we need not consider any of the prerequisites to creation of a parcel that preceded California's *393 first subdivision map statute in 1893 (Stats.1893, ch. 80, § 1, p. 96). Instead, the question presented by [CSB's] contention is whether a parcel so created is covered by the present Act's merger provisions." (Morehart, supra, 7 Cal.4th at p. 761, 29 Cal.Rptr.2d 804, 872 P.2d 143.)
In his concurring opinion in Morehart, Justice Mosk perceptively noted that the parcel "exists because [CSB] ... said it exists." (Morehart, supra, 7 Cal.4th at pp. 765-766, 29 Cal.Rptr.2d 804, 872 P.2d 143 (cone. opn. of Mosk, J.).) He observed the court had not reached the issue of whether pre 1893 antiquated subdivision maps created legal parcels: "The answer to that question awaits further judicialor legislative clarification." (Id. at p. 767, 29 Cal.Rptr.2d 804, 872 P.2d 143.)
Morehart not only did not decide the issue raised by this case, but it is distinguishable. Morehart involved whether a concededly created parcel was covered by the Act's merger provisions. We must decide whether the parcels at issue here were created in the first place by the 1865 recordation of the Greene Map. But some language of Morehart does have a bearing on our discussion.
CSB argued in Morehart that the Act's merger provisions did not apply to the lot at issue. CSB focused on section 66451.10, subdivision (a), which, if applicable, precluded automatic merger if contiguous parcels "have been created under the provisions of [the Act], or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, or ... were not subject to those provisions at the time of their creation. ..." (Morehart, supra, 7 Cal.4th at p. 766, 29 Cal. Rptr.2d 804, 872 P.2d 143.)
CSB argued the parcel at issue did not fall under the scope of this statute because the parcel, created as it was before any subdivision map law was in existence, was not established under or exempt from any law "`regulating the division of land.'" The Morehart court construed CSB's argument as follows: "In other words, the county reads section 66451.10(a)'s phrase, `not subject to those provisions at the time of their creation,' to mean `exempted from land-division provisions that were in existence at the time of the parcels' creation." (Morehart, supra, 7 Cal.4th at p. 761, 29 Cal.Rptr.2d 804, 872 P.2d 143.) The court "disagree[d] with that strained interpretation. If, when the parcels were created, no land-division provisions were in existence, the parcels necessarily Nvere not subject to those provisions at the time of their creation.'" (Ibid.)
This language from the Morehart opinion surfaces in Lakeview Meadows Ranch v. County of Santa Clara (1994) 27 Cal. App.4th 593, 32 Cal.Rptr.2d 615 (Lakeview), which involved three parcels dating from the 19th century. The County of Santa Clara (CSC) conceded that two parcels were legally created before 1893 by conveyanceby deeds executed in 1882 and 1892. (Lakeview, supra, at p. 596, 32 Cal.Rptr.2d 615.) Prior to 1893 parcels were typically created by conveyance. CSC disputed that the third parcel was legally created prior to 1893. The court concluded that it had been legally created by an 1891 federal patent, which is simply another form of conveyance. (Lakeview, supra, at pp. 596-598, 32 Cal.Rptr.2d 615; see Gomes v. County of Mendocino, supra, 37 Cal.App.4th at pp. 982-983, 44 Cal. Rptr.2d 93.)[3]
*394 The second issue in Lakeview was whether the three parcels were exempt from the Map Act under the grandfather clause of section 66499.30, subdivision (d), as parcels which were "in compliance with or exempt from any law ... regulating the design and improvement of subdivisions in effect at the time the subdivision was established." CSC argued that the parcels were not exempt from the Act: since the three parcels were created before 1893, they could not have been "`in compliance with or exempt from any law ... in effect at the time'" because there were no such laws then in effect. (Lakeview, supra, 27 Cal.App.4th at p. 599, 32 Cal.Rptr.2d 615.)
The Lakeview court found CSC's interpretation of the grandfather clause "at odds" with the Morehart court's interpretation of "similar language"the "`not subject to'" language of section 66451.10, subdivision (a). (Lakeview, supra, 27 Cal. App.4th at p. 599, 32 Cal.Rptr.2d 615.) "[CSC] tries to draw a distinction between parcels `exempt from any law' regulating subdivisions and parcels `not subject to' the provisions of any laws regulating subdivisions. However, we are unable to find any basis for this distinction. `Exempt' and `not subject to' have essentially the same meaning...." (Ibid.)
The Lakeview court was also influenced by section 66412.6, subdivision (a), on which appellants now rely. This grandfather clause provides that a parcel created prior to March 4, 1972, is presumed to be legally created if, at the time of its creation, it complied with any local ordinance governing a subdivision of less than five parcelsor if there was no such ordinance in effect. (Lakeview, supra, 27 Cal. App.4th at p. 599, 32 Cal.Rptr.2d 615.) Of course, the parcels in Lakeview were legally created by conveyance in 1882, 1891, and 1892, before the first subdivision law in 1893. But, the parcels in the present case were not created by conveyance, and the very issue before us is whether they were legally created by an antiquated subdivision map. Section 66412.6, subdivision (a) does not show a legislative intent that pre 1893 maps are deemed to "create" parcels.
Morehart and Lakeview are distinguishable from the case before us. Both decisions involved parcels which were already created, or considered "created" by a litigation concession. Neither decision directly addressed and resolved the issue of whether a parcel is legally created by virtue of the pre 1893 recordation of an antiquated subdivision map. We thus move on past our reference points into unexplored territory.
Appellants contend that the language and purpose of the Map Act support the conclusion that a pre-1893 antiquated subdivision map can legally create a cognizable parcel. Our examination of the Act and its purposes directs us to the opposite conclusion.
Appellants' contention leads us to an exercise in statutory interpretation. The interpretation of the Map Act, like that of any statute, is a question of law subject to de novo review on appeal. (Hill v. City of Clovis, supra, 80 Cal.App.4th at p. 446, 94 Cal.Rptr .2d 901.) The Act is to be liberally construed to apply to as many transfers or conveyances of land as possible, "in order to facilitate local regulation of the design and improvement of subdivisions. [Citation.]" (Taft, supra, 161 Cal. App.3d at p. 755, 207 Cal.Rptr. 840.) In accordance with the general rules of interpreting exemptions to statutes, exemptions to the Act are to be narrowly construed. (See City of Lafayette v. East Bay Mun. *395 Utility Dist. (1993) 16 Cal.App.4th 1005, 1017, 20 Cal.Rptr.2d 658.) As always, "[t]he fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (O'Kane v. Irvine (1996) 47 Cal.App.4th 207, 211, 54 Cal.Rptr.2d 549.)
Appellants argue that the text of the Act and the decisions in Morehart and Lakeview demonstrate the validity of antiquated subdivision maps. As we have discussed in detail above, Morehart and Lakeview are distinguishable and do not resolve the issue. Lakeview, which actually discussed the Map Act's section 66499.30, subdivision (d) grandfather clause, interpreted it with the aid of different language, that of the merger provision at issue in Morehart.
The legislature intended the grandfather clause to apply to subdivisions approved under prior versions of the Act, i.e., to exempt from the current Act those subdivisions established in compliance with or exempt from laws then in effect. The Legislature, with its strenuous emphasis on local control and approval of subdivisions, did not intend the grandfather clause to apply to the pre 1893 legal "State of Nature" when no subdivision statute was in existence. The legislative language dictates this result and nothing to the contrary appears in the Act.
Our conclusion is supported by Hays, supra, 217 Cal.App.3d 271, 266 Cal.Rptr. 856. Interpreting the grandfather clause of the 1929 version of the Act, the Hays court concluded that "[t]he clear purpose of the so-called `grandfather' clause is to protect developers who have detrimentally relied on an earlier state of the law." (Hays, supra, 217 Cal.App.3d at p. 289, 266 Cal.Rptr. 856.) The Map Act does not reveal a legislative intent to exempt recorded subdivision maps which were not subject to any subdivision law from a time when there was little land use regulation.
Indeed, as the Taft court noted in a similar context, if the Legislature wished to exempt antiquated maps from the Map Act, it could have done so in clear and express language. Grandfathering does not spring up by inference. For example, the Legislature in section 66412.6 provided for a presumption of lawful creation for parcels created before March 4, 1972, if the parcel resulted from a division of land in which fewer than five parcels were created and if at the time of the creation, there was no local ordinance in effect regulating such land divisions. The Legislature has not passed similar legislation for parcels like appellants'.
We find it significant that all of the various versions of the Map Act, from the second version enacted in 1907 to the present, have a grandfather clausebut the first version of the Map Act does not. Presumably in 1893 what we now call antiquated subdivision maps were much more commonhad the Legislature wished them to be exempt from the Map Act, the 1893 Act would have grandfathered in subdivision maps recorded prior to the effective date of the statute. For instance, the 1907 version of the Map Act specifically grandfathers in maps "filed or recorded prior to the taking effect of this act and in accordance with the laws in force at the time it was so filed or recorded." (Stats. 1907, ch. 231, § 8, p. 292.) (See 9 Miller & Starr, Cal. Real Estate (3d ed.2001) § 25:148, p. 361.) The 1893 Map Act did not have such a provision and did not grandfather in antiquated subdivision mapsand the Legislature has never explicitly exempted pre-1893 antiquarian *396 maps from the Map Act's scope.[4]
Finally, we reject appellants' contention that certain "turn of the century" case law supports their position. Appellants rely on decisions such as McCullough v. Olds (1895) 108 Cal. 529, 41 P. 420; Cadwalader v. Nash (1887) 73 Cal. 43, 14 P. 385; and Wolfskill v. County of Los Angeles (1890) 86 Cal. 405, 24 P. 1094, which generally involve conveyances of parcels by deed with reference to a map. None of these cases stands for the proposition that pre-1893 subdivision maps can legally create parcels.
We have reached our destination. Given the manifest purposes and language of the applicable statutes in the Map Act, we conclude that the Legislature did not intend that antiquated subdivision maps create legal parcels in the twenty-first century. Such maps recorded prior to the existence of the first Map Act in 1893 do not in themselves create parcels that are automatically subdividable.

III. DISPOSITION
The judgment denying the petition for writ of mandate is affirmed. Each party shall bear its own costs.
We concur: STEIN, Acting P.J, and SWAGER, J.
NOTES
[1] Subsequent statutory references are to the Government Code. The Subdivision Map Act is usually referred to either as "the Act" or "the Map Act."
[2] Except for certain attempted conveyances by appellants in 1996 and 1997, which are not at issue here.
[3] Although we need not formally discuss the issue, historically parcels have been created either by conveyance or by a recordation of a subdivision map in compliance with the Map Act. (See Lakeview, supra, 27 Cal.App.4th at pp. 596-598, 32 Cal.Rptr.2d 615; see also Gustafson, Antiquated Subdivisions, supra, at p. 52.)
[4] Appellants refer us to a curative statute that apparently was in effect between 1917 and 1953. That statute, however, only deemed cured any defects in maps such that they would be considered in compliance with laws in force at the time they were recorded.